132 F.3d 716
 19 ITRD 1961
 GERALD METALS, INC., Plaintiff-Appellant,
v.
The UNITED STATES, Defendant-Appellee.
and
Magnesium Corporation of America, International Union of
Operating Engineers, Local 564, and United
Steelworkers of America, Local 8319,
Defendant-Appellees.
 No. 97-1077.
 United States Court of Appeals,
Federal Circuit.
 Dec. 23, 1997.
Rehearing Denied; Suggestion for Rehearing In Banc Declined
April 13, 1998.
 
 Joseph Brooks, Popham, Haik, Schnobrich & Kaufman, Ltd., of Washington, DC, argued for plaintiff-appellant. With him on the brief was Denise Cheung. Of counsel on the brief were Frederick P. Waite and Kimberly R. Young, Holland & Knight, of Washington, DC.
 Andrea C. Casson, Attorney, United States International Trade Commission, of Washington, DC, argued for defendant-appellee United States. Also of counsel were Michael Deihl, Attorney, Office of General Counsel, U.S. International Trade Commission, of Washington, DC. With him on the brief were Lyn M. Schlitt, General Counsel and James A. Toupin, Deputy General Counsel.
 William D. Kramer, Baker & Botts L.L.P., of Washington, DC, for defendants-appellees Magnesium Corporation of America, et al. On the brief were Charles M. Darling, IV, and Michael X. Marinelli.
 Before MICHEL, CLEVENGER and RADER, Circuit Judges.
 RADER, Circuit Judge.
 
 
 1
 The International Trade Commission (Commission) found that Russian, Ukrainian, and Chinese imports of pure magnesium at less than fair value (LTFV) injured the domestic industry. See Magnesium from China, Russia, and Ukraine, 60 Fed.Reg. 26,456-57 (Int'l Trade Comm'n 1995) (final). Gerald Metals, an importer, appealed the injury determination, with respect to the Ukrainian imports, to the United States Court of International Trade. The court affirmed, finding substantial evidence that the domestic industry was materially injured by reason of the LTFV Ukrainian imports. See Gerald Metals, Inc. v. United States, 937 F.Supp. 930, 942 (Ct. Int'l Trade 1996). Because, on this record, substantial evidence does not support the Court of International Trade's analysis, this court vacates and remands to the Court of International Trade for further proceedings.
 
 I.
 
 2
 Primary magnesium is decomposed from raw materials into magnesium metal or alloy. The United States Department of Commerce, International Trade Administration (Commerce) divides primary magnesium into two classes, pure and alloy. Pure magnesium encompasses: (1) "pure" products that contain at least 99.8%, by weight, primary magnesium and (2) "off-specification pure" products that contain at least 50% to 99.8%, by weight, primary magnesium. Alloy magnesium contains 50% to 99.8%, by weight, primary magnesium; however, alloy is mixed with other chemical elements that constitute at least 1.5%, by weight, of the product.
 
 
 3
 Pure magnesium is both a chemical reagent in the desulfurization and chemical reduction industries and an input in the production of alloy. Pure magnesium has value in the markets for aluminum, steel, magnesium granule, and pharmaceuticals. During the period of investigation, from the beginning of 1992 through the first half of 1994, demand for pure magnesium in the United States remained relatively steady, with only a slight increase.
 
 
 4
 Due to the unique characteristics of magnesium production, production--both domestic and foreign--remains relatively steady. Pure and alloy magnesium production requires electrolytic cells that deteriorate if left unused. To avoid the high cost of rebuilding cells and to maximize production efficiency, producers generally maintain continuous and steady production levels of pure magnesium.
 
 
 5
 In August 1992, before the petition at issue was filed, the Commission had found that unfairly traded pure magnesium imports from Canada materially injured the domestic pure magnesium industry. See Magnesium from Canada, Inv. Nos. 701-TA-309 and 731-TA-528 (final), USITC Pub. 2550 (August 1992). Following this determination, Canadian imports declined. Imports from Russia, Ukraine, and China began entering the United States, in part due to liquidation of stockpiles of magnesium in the former Soviet Union.
 
 
 6
 On March 31, 1994, the Magnesium Corporation of America, the International Union of Operating Engineers, Local 564, and the United Steelworkers of America, Local 8319, filed an antidumping petition against these imports under section 773 of the Tariff Act of 1930, codified as amended at 19 U.S.C. § 1677(b) (1988).* See Gerald Metals, 937 F.Supp. at 932. Later, the Dow Chemical Company (Dow) joined the petition. See id. Commerce determined that pure and alloy magnesium imports were sold at LTFV under section 733(b) of the Tariff Act. See id.
 
 
 7
 On May 17, 1995, the Commission published its final determinations with respect to the subject imports. See Magnesium from China, Russia and Ukraine, USITC Pub. 2885, Inv. Nos. 731-TA-696-698 (May 1995) (hereinafter Determination ). The Commission unanimously found no material injury to the domestic industry due to LTFV imports of alloy magnesium from China and Russia. See Gerald Metals, 937 F.Supp. at 933. However, a plurality of three commissioners found material injury to the domestic industry by reason of LTFV imports of pure magnesium from Russia, Ukraine, and China; the remaining three commissioners dissented from this determination. See id. at 932-33. Because the commissioners were evenly divided on the question of material injury by reason of the pure magnesium imports, the views of the plurality finding material injury constitute the determination of the Commission, pursuant to 19 U.S.C. § 1677(11) (1994).
 
 
 8
 Gerald Metals appealed the Commission's material injury determination with respect to the LTFV imports of pure magnesium from the Ukraine. The antidumping petitioners, the Magnesium Corporation of America, the International Union of Operating Engineers, Local 564, and the United Steelworkers of America, Local 8319, also participated in the appeal as defendants-appellees. The record does not indicate any further participation by petitioner Dow.
 
 
 9
 Much of the record features information about imports from Russia. Specifically, the record shows, in the words of Vice Chairman Nuzum, that "a sizeable portion of the imports from Russia were fairly[-]traded. These imports undersold domestic product almost as frequently as did LTFV imports." Determination at 35 (Vice Chairman Nuzum, dissenting views). Similarly the record shows, in the words of Commissioner Crawford, that "[d]umped Russian imports and fairly[-]traded Russian imports are very close, if not perfect, substitutes for each other." Id. at 45 (Comm'r Crawford, dissenting views).
 
 
 10
 All pure magnesium from Russia originates with one of two producers--Avisma Titanium-Magnesium Works (Avisma) and Solikamsk Magnesium Works (SMW). Although trading companies can import Russian pure magnesium from only these two sources, Commerce assigned zero percent dumping margins to some companies, such as Gerald Metals, while assigning margins of 100.25% to other companies. Commerce assigned to all trading companies importing pure magnesium from Ukraine margins greater than zero, ranging from 36.05% to 104.27%. Commerce assigned a margin of 108.26% to all Chinese imports.
 
 
 11
 Gerald Metals imported both fairly-traded Russian pure magnesium and LTFV Ukrainian pure magnesium. Gerald Metals reasons that because fairly-traded Russian imports are substitutes for LTFV Russian imports, domestic purchasers of magnesium products could fill their demand without resort to LTFV imports. Thus, Gerald Metals argues, the LTFV goods did not cause the injury to domestic industry. Instead, the injury was the result of market forces other than unfair trading.
 
 
 12
 The Court of International Trade found substantial evidence to support the Commission's determination. Gerald Metals appeals. At issue before this court are the Commission's findings that: (1) the market availability of fairly-traded Russian pure magnesium imports did not preclude the causation of material injury by LTFV imports; (2) Dow closed a magnesium production plant in part due to the effect of the LTFV imports, including Ukrainian imports; and (3) the imposition of antidumping duties against Gerald Metals was remedial rather than penal.
 
 II.
 
 13
 This court duplicates the Court of International Trade's review of the Commission's determinations, evaluating whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). Although technically "reviewing anew the [Commission's] determination, this court will not ignore the informed opinion of the Court of International Trade. That court reviewed the record in considerable detail. Its opinion deserves due respect." Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 983 (Fed.Cir.1994).
 
 
 14
 Applying an analytical framework outlined in Title 19, the Commission determines whether LTFV imports materially injure a domestic industry. See 19 U.S.C. § 1673d(b)(1) (1988). Section 1677(7)(A) defines "material injury" as a "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1988). When determining whether imports have caused material injury to a domestic industry, the Commission evaluates:
 
 
 15
 (I) the volume of imports of the merchandise that is the subject of the investigation,
 
 
 16
 (II) the effect of imports of that merchandise on prices in the United States for domestic like products, and
 
 
 17
 (III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States....
 
 
 18
 19 U.S.C. § 1677(7)(B)(i) (1988). Additionally, the Commission "may consider such other economic factors as are relevant to the determination." 19 U.S.C. § 1677(7)(B)(ii) (1988).
 
 
 19
 However, a showing that economic harm to domestic industry occurred when LTFV imports are also on the market is not enough to show that the imports caused a material injury. See United States Steel Group v. United States, 96 F.3d 1352, 1358 (Fed.Cir.1996) ("[T]o claim that the temporal link between these events proves that they are causally related is ... fallacy...."). An affirmative injury determination requires both (1) present material injury and (2) a finding that the material injury is "by reason of" the subject imports. Chaparral Steel Co. v. United States, 901 F.2d 1097, 1104 (Fed.Cir.1990) (quoting American Spring Wire Corp. v. United States, 590 F.Supp. 1273, 1276 (Ct. Int'l Trade 1984), aff'd sub nom. Armco, Inc. v. United States, 760 F.2d 249 (Fed.Cir.1985)); see also Trent Tube Div. v. Avesta Sandvik Tube AB, 975 F.2d 807, 814 (Fed.Cir.1992) (affirming the Court of International Trade's remand to the Commission when conclusions on material injury were based on factors that related "almost exclusively to the existence, rather than the causation, of the material injury"). Hence, the anti-dumping statute mandates a showing of causal--not merely temporal--connection between the LTFV goods and the material injury.
 
 
 20
 Because this appeal hinges on whether the subject imports caused the injury, this court reviews the record evidence to determine whether substantial evidence supports the Commission's determination that the domestic industry was injured by reason of the subject imports. Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Suramerica, 44 F.3d at 985 (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). However, the substantial evidence standard requires more than mere assertion of " 'evidence which in and of itself justified [the Commission's determination], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.' " Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 487, 71 S.Ct. 456, 463, 95 L.Ed. 456 (1951)). Rather " '[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.' " Id. (quoting Universal Camera, 340 U.S. at 488, 71 S.Ct. at 464). In sum, the question before this court on review is whether "the administrative record contain[s] substantial evidence to support [the determination] and was it a rational decision?" Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed.Cir.1984).
 
 III.
 
 21
 The central dispute in this case is the Commission's asserted failure to incorporate the undisputed facts about fairly-traded Russian imports into its analysis of the harm caused by reason of the cumulated LTFV imports. Although the record contained surveys of purchaser comparisons of domestic product to the subject imports, there is no similar evidence of product differentiation, non-price differences, or differences in terms and conditions between the two classes of Russian imports--fairly traded and LTFV. See Determination at 45 (Comm'r Crawford, dissenting views).
 
 
 22
 Indeed, only two producers were responsible for all Russian imports. The primary difference in the price and treatment of Russian pure magnesium depended on which trading company imported the product. Pricing by different trading companies, which had dumping margins of either zero percent or 100.25%, determined whether the magnesium arrived as fairly-traded or LTFV. Therefore, only one reasonable conclusion can be drawn from the record: other than differences in the trading company, the Russian imports--both fairly-traded and LTFV--were perfect substitutes for each other, if not the exact same product.
 
 
 23
 Similarly, Russian and Ukrainian pure magnesium products compete with one another. The Commission noted that the parties to the investigation did not dispute that LTFV imports from Russia and Ukraine competed with one another. Although there was some evidence of product quality differences between these imports, the Commission nonetheless concluded that its supposition was confirmed by other purchasers who stated that they did not differentiate between Russian or Ukrainian magnesium when dealing with the Commonwealth of Independent States (the association of former Soviet Union republics). Thus, the record supports the inference that Russian imports, either fairly-traded or LTFV, are substitutes for LTFV Ukrainian imports.
 
 
 24
 LTFV Chinese imports were found to compete for sales with the subject imports from Russia and Ukraine. See Determination at 23 (views of the Commission). In fact, "numerous ... purchasers ... opined that the Chinese magnesium is comparable in quality to and/or can be used for the same uses as the domestic product and as the Russian and Ukrainian imports." Id. at 25 n. 94. Thus, the record shows that the Commission viewed LTFV Chinese imports as close substitutes with both classes of Russian imports and LTFV Ukrainian imports. See id. at 44 (Comm'r Crawford, dissenting views).
 
 
 25
 These aspects of the record point to a gap in the causal nexus between the LTFV Ukrainian imports and material harm to domestic industry. The Court of International Trade acknowledged this causation problem, but, without citing adequate record support, dismissed this evidence. See Gerald Metals, 937 F.Supp. at 934-36.
 
 
 26
 First, the Court of International Trade found no evidence supporting Gerald Metals' claim that fairly-traded Russian imports would have replaced all or the greater part of the subject imports. See id. at 936. The court stated that Gerald Metals had premised this argument on the false assumption that producers would switch to different importers trading at fair value in the same way that domestic consumers switch to different trading companies when buying pure magnesium. See id. at 936 n. 24. According to the court, domestic consumers use non-price factors to select a trading partner. See id.
 
 
 27
 A more reasonable view of the record, however, contradicts these conclusions. At the beginning of the period of investigation, the cumulated LTFV imports had a greater market share than the Russian fairly-traded imports; however, by the end of the period, the market share of the fairly-traded Russian imports was greater than that of the LTFV imports. Comparing the quantities purchased by domestic consumers during the entire period reveals that the sales of Russian LTFV product just slightly exceeded that of the fairly-traded Russian product. In fact, the quantity of all Russian pure magnesium sales--including both fairly-traded and LTFV--was three times the combined quantity of sales of LTFV imports from Ukraine and China.
 
 
 28
 The Court of International Trade apparently failed to evaluate this data in conjunction with the fact that all Russian magnesium originated from only two producers. As previously indicated, the importer, not the producer, set the price and determined whether Russian magnesium was fairly-traded or LTFV. The domestic consumption and market penetration data reveal that Russian producers sold to fairly-trading importers almost as often as to unfairly trading importers and that domestic purchasers acquired Russian imports from both types of importers in roughly similar amounts.
 
 
 29
 Indeed, this evidence demonstrates that, contrary to the Court of International Trade's analysis, domestic purchasers were not repelled from the LTFV imports as compared to fairly-traded imports because of non-price factors. This inference is underscored by the fact that the same importer, Gerald Metals, sold fairly-traded Russian product as well as LTFV Ukrainian product to domestic purchasers. Without further explanation, this court cannot adequately review the Court of International Trade's dismissal of the prospect that fairly-traded goods would have replaced LTFV goods.
 
 
 30
 The Court of International Trade also reasoned that the Commission's injury determination did not rest upon the purported shift of all domestic purchasers of LTFV magnesium to domestic product. In fact, the domestic industry framed its material injury case not in terms of lost sales but in terms of the inability of domestic producers to raise prices without suffering lost sales volume. See id. at 936.
 
 
 31
 After the suspension of LTFV imports of pure magnesium from Canada in 1991-92, the domestic industry apparently expected to raise prices for its pure magnesium. At this time, imports--both LTFV and fairly-traded--entered the United States due in part to liquidation of stockpiles in the former Soviet Union. These imports apparently disrupted the expectation of higher prices for domestic products. The enhanced availability on the world market of magnesium from the former Soviet Union is one of the relevant economic factors influencing both the finding of injury and causation.
 
 
 32
 Determining the accurate causation of a disrupted market expectation, however, requires careful economic evidence and analysis. The anti-dumping statute requires that the Commission consider all relevant economic factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii) (1988). Generally, a sudden increase in world supply in the face of a relatively stable demand results in lower prices. While the statute protects domestic magnesium producers from injury caused by LTFV imports, its scope of protection does not reach so far as to support artificially inflated prices when fairly-traded imports are underselling the domestic product and LTFV imports are readily convertible to fairly-traded product by merely changing importers.
 
 
 33
 The Court of International Trade erred by applying an incorrect legal test for the amount of contribution to material harm by LTFV goods necessary to satisfy the "by reason of" standard. The court stated that "[e]ven though fairly-priced imports may have been another cause of injury, the Commission has a statutory obligation not to weigh causes," and "[t]hus ... correctly did not compare the impact of subject imports to the impact of other factors, like the fairly-traded imports." Gerald Metals, 937 F.Supp. at 936. Thus, the court followed the reasoning that any contribution constitutes sufficient causation to satisfy the "by reason of" test.
 
 
 34
 To the contrary, the statute requires the injury to occur "by reason of" the LTFV imports. This language does not suggest that an importer of LTFV goods can escape countervailing duties by finding some tangential or minor cause unrelated to the LTFV goods that contributed to the harmful effects on domestic market prices. By the same token, this language does not suggest that the Government satisfies its burden of proof by showing that the LTFV goods themselves contributed only minimally or tangentially to the material harm.
 
 
 35
 The Court of International Trade's review of the record propagates the Commission's misapplication of the "by reason of" test by relying on broad language in the Senate report at the time of enactment of title 19. The report suggested that the Commission need not "contemplate that the effects from the subsidized imports be weighted against the effects associated with other factors ... which may be contributing to overall injury to an industry[;][n]or is the issue whether the [LTFV] imports are the principal, a substantial, or a significant cause of material injury." S.Rep. No. 96-249, at 57 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 443. See also Citrosuco Paulista, S.A. v. United States, 704 F.Supp. 1075, 1101 (Ct. Int'l Trade 1988).
 
 
 36
 In support of this reasoning, Commerce cites this court's apparent endorsement of the non-de minimis mode of analysis as one possible way to present sufficient evidence to satisfy the statute's causation requirement. See United States Steel, 96 F.3d at 1361-62. In this two-step inquiry, the Commission "first assesses the state of the relevant domestic industry," and if the industry is materially injured, the analysis proceeds "to its second step, which considers whether the pertinent imports contribute in a non-de minimis way to such material injury." Id. at 1361.
 
 
 37
 In United States Steel, however, this court did not incorporate the relaxed standard of the Senate report into the statute's causation requirement. A careful reading of United States Steel reveals that this court did not cite the Senate report nor even endorse any specific methodology, including the non-de minimis method, for assessing the causation of material injury. See id. at 1362. Instead, this court hinged the adequacy of a given methodology upon whether it produced sufficient evidence to satisfy the statutory "by reason of" requirement. Id. In fact, contrary to Commerce's view of United States Steel, the decision supports the notion that evidence of de minimis (e.g., minimal or tangential) causation of injury does not reach the causation level required under the statute.
 
 
 38
 Hence, the statute requires adequate evidence to show that the harm occurred "by reason of" the LTFV imports, not by reason of a minimal or tangential contribution to material harm caused by LTFV goods. Given the unique circumstances of this case, the record, without more, does not show that LTFV imports of pure magnesium from Ukraine were the reason for the harmful effects to the domestic magnesium industry.
 
 
 39
 Accordingly, this court concludes that the Court of International Trade failed to consider properly the presence of fairly-traded Russian imports in affirming the Commission's determination of material injury by reason of the LTFV goods.
 
 IV.
 
 40
 Two causation issues remain: the closure of Dow's magnesium production plant and the nature--penal or remedial--of the duties imposed in this case. The Court of International Trade held that substantial evidence supported the Commission's determination that LTFV imports caused Dow's plant closing. See Gerald Metals, 937 F.Supp. at 939. The court accepted the plurality's credibility determinations with respect to the Dow witnesses. See id. at 938. More particularly, the court focused on the declining market share and accompanying price depression of domestic pure magnesium, which is generally produced at constant levels. See id. at 937. According to the court, Dow's decision to cut production levels by shutting down the plant was a response to the supply of subject imports and a way to prevent further price depression.
 
 
 41
 Again, the Court of International Trade's analysis lacks supporting economic data and evidence. Specifically, the presence of the fairly-traded Russian imports again shows the insufficiency of the court's causation analysis. This presence, coupled with the substitutability of all Russian imports and other LTFV imports, suggests that the plant's closing was not caused simply by the presence of LTFV imports. Rather, the factual record points to market forces, including the increase in the supply of pure magnesium on the global market as the actual cause for the closing.
 
 
 42
 Like the Court of International Trade, this court accepts the credibility determinations of the Commission's plurality, even though at least two commissioners found no clear support for Dow's assertions. See Determination at 30 (Chairman Watson, dissenting views); id. at 36 (Vice Chairman Nuzum, dissenting views). Dow's testimony itself, however, supports global market conditions as the cause of the plant's closing. Specifically, Mr. Frank Pettiti, a Dow global business manager, testified that "Russian, Ukrainian, and Chinese magnesium [was] being sold in the [United States] and world markets at prices that appeared to have no bottom so long as the producers received hard currency in exchange for their goods." This statement, as well as the ample record evidence about fairly-traded Russian imports, can only indicate that market forces other than LTFV goods depressed the domestic price expectations.
 
 
 43
 Finally, proper consideration of the effect of fairly-traded imports on the domestic market, including Dow's magnesium plant, is also necessary to assess whether the dumping duties are remedial rather than punitive. Gerald Metals imported LTFV Ukrainian pure magnesium; this fact alone does not support the imposition of duties. See Chaparral Steel Co., 901 F.2d at 1103. Rather, the imposition of duties must be based on substantial evidence of material harm to the domestic industry by reason of the LTFV imports from Russia, Ukraine, and China. See id.
 
 
 44
 Accordingly, this court vacates the Court of International Trade's decision that the Commission's affirmative injury determination is supported by substantial evidence and otherwise in accordance with the law and remands to the court for further proceedings consistent with this opinion.
 
 COSTS
 
 45
 Each party shall bear its own costs.
 
 
 46
 VACATED and REMANDED.
 
 
 
 *
 The Uruguay Round Agreement Act, Pub.L. No. 103-465, tit. II, 108 Stat. 4809, 4842 (1994), amended the antidumping laws, effective January 1, 1995. Because this investigation was initiated before the effective date, it is regulated under the pre-existing antidumping statute. See id. at § 291(a)(2), (b)