# United States Court of Appeals for the Federal Circuit

05-1213

BRATSK ALUMINIUM SMELTER, RUAL TRADE LIMITED,
and GENERAL ELECTRIC SILICONES LLC,

Plaintiffs,

and

SUAL HOLDING and ZAO KREMNY,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

GLOBE METALLURGICAL INC. and SIMCALA, INC.,

Defendants-Appellees.

Frederick P. Waite, Vorys, Sater, Seymour and Pease LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief was Kimberly R. Young.

June B. Brown, Attorney, Office of General Counsel, United States International Trade Commission, of Washington, DC, argued for defendant-appellee United States. On the brief were James M. Lyons, General Counsel, Andrea C. Casson, Acting Assistant General Counsel, and Irene H. Chen, Attorney.

William D. Kramer, DLA Piper Rudnick Gray Cary US LLP, of Washington, DC, argued for defendants-appellees Globe Metallurgical Inc. and Simcala, Inc. With him on the brief was Clifford E. Stevens, Jr. Of counsel was Martin Schaefermeier.

Appealed from: United States Court of International Trade

Senior Judge Nicholas Tsoucalas

# United States Court of Appeals for the Federal Circuit

05-1213

BRATSK ALUMINIUM SMELTER, RUAL TRADE LIMITED,
and GENERAL ELECTRIC SILICONES LLC,

Plaintiffs,

and

SUAL HOLDING and ZAO KREMNY,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

GLOBE METALLURGICAL INC. and SIMCALA, INC.,

Defendants-Appellees.

_____

DECIDED:  April 10, 2006
_____

Before GAJARSA, <u>Circuit Judge</u>, ARCHER, <u>Senior Circuit Judge</u>, and DYK, <u>Circuit Judge</u>.

Opinion for the court filed by <u>Circuit Judge</u> DYK.  Dissenting opinion filed by <u>Senior Circuit Judge</u> ARCHER.

DYK, <u>Circuit Judge</u>.

SUAL Holding and ZAO Kremny (collectively "appellants") appeal from the judgment of the United States Court of International Trade affirming the International

Trade Commission's ("Commission") determination that domestic industry was materially injured by reason of silicon metal imports from Russia that were sold at less than fair market value ("LTFV"). We vacate the Court of International Trade's decision and remand for further proceedings.

BACKGROUND

In antidumping proceedings, the Commission is charged with determining whether an industry in the United States has suffered, or is threatened with, material injury by reason of imports. 19 U.S.C. § 1673d(b) (2000). Material injury determinations are particularly difficult where the imports sold at LTFV compete with identical imports not sold at LTFV.

The product involved here is silicon metal. Silicon metal is a commodity product, meaning that it is generally interchangeable regardless of its source. Therefore, price is the primary consideration for purchasers of silicon metal. The market for silicon metal consists of three segments: chemical, primary aluminum, and secondary aluminum. During the pertinent time period there were ten countries, other than the United States, which supplied silicon metal to the U.S. market: Argentina, Brazil, Canada, China, Korea, Norway, Russia, Saudi Arabia, South Africa, and Spain.

On March 7, 2002, Globe Metallurgical Inc., SIMCALA Inc., and several union groups filed an antidumping petition with the Commission and with the United States Department of Commerce ("Commerce"), alleging that Russian imports of silicon metal at LTFV had materially injured the domestic industry. On February 11, 2003, Commerce rendered its final determination that the subject imports were, or were likely

to be, sold at LTFV. On March 24, 2003, the Commission determined that the domestic industry was materially injured by reason of the subject imports.

The Commission relied on market data over a three-year period, 1999-2001, as well as data for specific periods between January-September 2001 and 2002, and, as required by the statute, considered subject import volume, the effect of subject imports on domestic prices, and the impact of subject imports on domestic producers. 19 U.S.C. § 1677(7)(B)(i), (C) (2000). First, the Commission found that subject import volume was significant and that subject import volume increased from 1999 to 2001, while domestic producers lost market share. The Commission also noted, however, that the domestic industry was able to satisfy only a portion of U.S. silicon metal demand.

The Commission next considered what effect subject imports had on domestic prices. The Commission noted that "price is very important in purchasing decisions, given the commodity-like nature of the subject product." Using purchaser price data, the Commission found that during the period of investigation, subject imports almost always undersold the domestic product in all three market segments. In response to the argument that all imports, not just subject imports, undersold the domestic product, the Commission stated that "price data for nonsubject imports shows that imports from Russia have been priced at lower levels than nonsubject imports," and concluded that "[i]n light of subject imports' increasing volumes and their significant underselling of, and high substitutability with, both domestic and nonsubject silicon metal, we find significant price depression by the subject imports." The Commission further noted:

> We recognize that nonsubject imports may have had an independent price depressive effect on domestic silicon metal prices. However, given the

significant underselling by subject imports, subject import volume surges during the POI, and the high degree of substitutability between subject imports and the domestic product, we find that subject imports themselves have significantly depressed domestic silicon metal prices in all three customer segments . . . .

Finally, the Commission turned to the impact of subject imports on domestic producers and concluded that, given the significant volume and price effects of the subject imports, subject imports had a significant adverse effect on the domestic industry. The Commission considered the domestic industry's drop in market share, as well as the fact that certain silicon metal furnaces had been closed or converted for other uses. The Commission "acknowledge[d] that domestic industry lost market share to nonsubject imports as well," but concluded that "[r]egardless of the impact of nonsubject imports on the domestic industry, we find, in this investigation, that the surges in subject import volume at prices that undersold and depressed domestic silicon metal prices to a significant degree during the POI had a material adverse impact on the domestic industry."

Appellants[1] argued that our decision in Gerald Metals, Inc. v. United States, 132 F.3d 716 (Fed. Cir. 1997) required a specific determination as to whether the non-subject imports would simply replace the subject imports, with the same impact on domestic products, if the subject imports were excluded from the market. The Commission made no such determination and dismissed our decision in Gerald Metals as being factually distinguishable.

---

[1] Plaintiffs below, Bratsk Aluminium Smelter and RUAL Trade Limited, filed a voluntary notice of dismissal on December 6, 2004, and are thus not parties to this appeal. However, the remaining plaintiffs, SUAL Holding and ZAO Kremny, continued in the litigation and are appellants in this case.

Appellants challenged several aspects of the Commission's determination in the Court of International Trade, including whether the Russian imports actually caused injury to the domestic industry. The court made no ruling with respect to the causation issue but remanded the case to the Commission on an unrelated issue. The court noted that it would "consider the remaining issues raised by Plaintiffs upon review of the remand determination." Bratsk Aluminum Smelter v. United States, No. 03-00200, 2004 WL 1385848, at *11 (Ct. Int'l Trade June 22, 2004). On remand, the Commission incorporated its initial decision by reference and then clarified some of its findings. On December 3, 2004, the Court of International Trade affirmed the Commission's remand determination "in its entirety" and dismissed the case, stating that "all other issues have been decided . . . ." SUAL Holding and ZAO Kremny timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## DISCUSSION

The sole point of contention in this appeal is whether the Commission established that the injury to the domestic industry was "by reason of" the subject imports.[2]

I

The antidumping statute states that the "Commission shall make a final determination of whether . . . an industry in the United States . . . is materially injured . .

---

[2] "We apply anew the standard of review applied by the Court of International Trade in its review of the administrative record. We therefore uphold the Commission's determination unless it was arbitrary and capricious or unsupported by substantial evidence on the record, or otherwise not in accordance with law." Timken U.S. Corp. v. United States, 421 F.3d 1350, 1354 (Fed. Cir. 2005) (internal citation and quotation marks omitted); 19 U.S.C. § 1516a(b)(1)(B)(i) (2000).

. . . by reason of imports . . . ." 19 U.S.C. § 1673d(b) (2000). In making this determination, the Commission must consider:

> (I) the volume of imports of the subject merchandise,
> (II) the effect of imports of that merchandise on prices in the United States for domestic like products, and
> (III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States . . . .

19 U.S.C. § 1677(7)(B)(i) (2000). "An affirmative injury determination requires both (1) present material injury and (2) a finding that the material injury is '<u>by reason of</u>' the subject imports." <u>Gerald Metals, Inc.</u>, 132 F.3d at 719 (emphasis added). We have previously explained that the "by reason of" requirement "mandates a showing of causal—not merely temporal—connection between the LTFV goods and the material injury." <u>Id.</u> at 720. We have not required the Commission to employ any particular methodology for determining whether this causation element has been met,[3] and the "Commission need not isolate the injury caused by other factors from injury caused by unfair imports . . . ." <u>Taiwan Semiconductor Industry v. Int'l Trade Comm'n</u>, 266 F.3d 1339, 1345 (Fed. Cir. 2001) (quoting legislative history of the Uruguay Round Agreements Act); <u>see also</u> <u>Nippon Steel Corp. v. Int'l Trade Comm'n</u>, 345 F.3d 1379, 1381 (Fed. Cir. 2003) ("'[D]umping' need not be the sole or principal cause of injury."). However, we have made clear that causation is not shown if the subject imports contributed only "minimally or tangentially to the material harm." <u>Gerald Metals</u>, 132

---

[3] In <u>United States Steel Group v. United States</u>, 96 F.3d 1352 (Fed. Cir. 1996), we noted that the Commission uses different methodologies in determining whether the domestic injury was "by reason of" the LTFV imports. <u>Id.</u> at 1361-62. We then found that the antidumping statute "on its face compels no [ ] uniform methodology, and we are not persuaded that we should create one, even were we so empowered." <u>Id.</u> at 1362.

F.3d at 722; see also Nippon Steel Corp., 345 F.3d at 1381; U.S. Steel Group v. United States, 96 F.3d 1352, 1361-62 (Fed. Cir. 1996).

The Commission, like other federal agencies, "must examine the relevant data and articulate a satisfactory explanation for its action . . . . Normally, an agency rule would be arbitrary and capricious if the agency . . . entirely fail[s] to consider an important aspect of the problem." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Where commodity products are at issue and fairly traded, price competitive, non-subject imports are in the market, the Commission must explain why the elimination of subject imports would benefit the domestic industry instead of resulting in the non-subject imports' replacement of the subject imports' market share without any beneficial impact on domestic producers.

In Gerald Metals, the Commission determined that Ukranian imports of pure magnesium at LTFV injured the domestic industry. The Commission's determination did not discuss whether non-subject imports, namely fairly-traded Russian imports, would have replaced all or a greater part of the subject imports. Three dissenting commissioners found that the presence of the non-subject imports undermined the causation determination. Magnesium from China, Russia, and Ukraine, U.S. Int'l Trade Comm'n Pub. 2885, Inv. Nos. 731-TA-696-698 at 29 (Chairman Watson, dissenting), 35-36 (Vice Chairman Nuzum, dissenting), and 48 (Comm'r Crawford, dissenting) (May 1995) (final). The dissenters noted that non-subject imports were perfect substitutes for the Ukranian subject imports and frequently undersold the domestic product just as the Ukranian imports had. Magnesium from China, Russia, and Ukraine at 35 (Vice

Chairman Nuzum, dissenting), 45 (Comm'r Crawford, dissenting); <u>see also</u> <u>Gerald Metals</u>, 132 F.3d at 718-19.

The Court of International Trade, while acknowledging that the Commission did not discuss the issue of substitutability, affirmed the Commission's finding of material injury. <u>Gerald Metals, Inc. v. United States</u>, 937 F. Supp. 930, 935 n.22, 936 (Ct. Int'l Trade 1996). On appeal, we vacated the court's decision and explained that the Commission must "'take[ ] into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" 132 F.3d at 720 (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 487 (1951)). Given that the fairly-traded non-subject imports were substitutable for the Ukranian subject imports and undersold the domestic product just as the subject imports had, we held that the Commission must explain, in its analysis of the harm caused by the subject imports, why domestic consumers would not have purchased the fairly traded non-subject imports. <u>See</u> <u>id.</u> at 718, 720, 721-23.[4]

This court applied the reasoning of <u>Gerald Metals</u> in <u>Taiwan Semiconductor</u>. There, the Commission—after two remands from the Court of International Trade on the issue of causation—determined that Taiwanese imports of static random access memory chips ("SRAMs") at LTFV had not injured the domestic industry. 266 F.3d at 1342. The Commission concluded that "the volume of subject imports, and increase in volume [of subject imports], are not sufficient to demonstrate that the subject imports themselves made a material contribution to any injury experienced by the domestic

---

[4] As we explained in <u>Taiwan Semiconductor Industry v. International Trade Commission</u>, 266 F.3d 1339 (Fed. Cir. 2001), "<u>Gerald Metals</u> applied the antidumping law as it existed prior to amendment effective on January 1, 1995, by the Uruguay Round Agreements Act (URAA) . . . . The URAA did not deviate from the pre-existing causation standard enunciated in <u>Gerald Metals</u>." <u>Id.</u> at 1345.

industry." Id. at 1346 (quoting the Commission's Redetermination). In particular, the Commission found that non-subject Korean imports of SRAMs were, like the subject imports, priced lower than the domestic product, and were at times priced lower than the subject imports as well. Id. at 1347. We affirmed the Commission's determination, noting that "substantial evidence supports the fact that the United States market share was impacted largely by non-subject imports," and that "[i]n Gerald Metals, as in this case, the record did not show that the subject imports caused the material injury in light of the dominant presence of non-subject imports in the marketplace." Id. at 1345-46, 1347.

Thus under Gerald Metals, the increase in volume of subject imports priced below domestic products and the decline in the domestic market share are not in and of themselves sufficient to establish causation. Gerald Metals did not, of course, establish a per se rule barring a finding of causation where the product is a commodity product and there are fairly traded imports priced below the domestic product. However, under Gerald Metals, the Commission is required to make a specific causation determination and in that connection to directly address whether non-subject imports would have replaced the subject imports without any beneficial effect on domestic producers.

II

The antidumping investigation here revealed the same conditions that triggered the additional causation inquiry in Gerald Metals and Taiwan Semiconductor, as the Commission found silicon metal generally interchangeable regardless of where it is produced. Non-subject imports were present in the U.S. market during the period of investigation and were a significant factor in the U.S. market. As a percentage of total

imports (by quantity), non-subject imports accounted for approximately 79.6% in 1999, 82.6% in 2000, and 73.0% in 2001.

Further, while the subject imports generally undersold the domestic product, there was evidence that non-subject imports from Brazil, Canada, Saudi Arabia, and South Africa generally undersold the domestic product during the period of investigation. These circumstances suggest that the elimination of the subject imports from the domestic market might simply have increased the market share of the non-subject imports. Gerald Metals thus requires the Commission to explain why—notwithstanding the presence and significance of the non-subject imports—it concluded that the subject imports caused material injury to the domestic industry. While there may be support for the Commission's ultimate determination of material injury in the record here, we find that the Commission did not sufficiently explain its decision in this regard.

The failure of the agency to explain its causation analysis in accordance with Gerald Metals is particularly troubling in this case because of the agency's claim that it is not obligated to follow this court's precedent. The Commission sought to dismiss Gerald Metals as having no precedential value in other anti-dumping investigations, stating that "the prior Commission investigations cited by respondents are factually distinguishable from the instant investigation." On appeal, the Commission continues to dismiss our precedent by attempting to limit Gerald Metals to its "unique facts" and explaining that "the instant investigation is not factually analogous either to Gerald Metals or Taiwan Semiconductor." Commission's Br. at 33, 35. In particular, the Commission stated that Gerald Metals and Taiwan Semiconductor are distinguishable

because in both of those cases, non-subject import volume increased while the subject import volume decreased or remained the same. The Commission is obligated to follow the holdings of our cases, not to limit those decisions to their particular facts. The holding of Gerald Metals is not limited to situations in which non-subject imports increased during the period of review. The obligation under Gerald Metals is triggered whenever the antidumping investigation is centered on a commodity product, and price competitive non-subject imports are a significant factor in the market.

In its decision, the Commission also attempted to support the link between subject imports and the domestic injury by pointing out that after subject imports were withdrawn from the market in 2002 following the Department of Commerce's preliminary determination, silicon spot prices increased and prices for eleven domestic contracts increased during the fourth quarter of 2002. That spot prices may have increased after the Russian imports exited the market may be pertinent to the causation question, but that fact does not excuse the Commission's failure to address directly the causation issue in detail as required by Gerald Metals. The Commission did not explain how much the spot prices increased, the significance of that increase, or the significance of the eleven contracts for the domestic market.

Finally on appeal, among other things, the Commission argues that the appellant "has not demonstrated" that "nonsubject imports were well positioned to completely fill any void left by the withdrawal of subject imports from the market." Gov't Br. at 35-36. Presumably, this is an argument that non-subject imports could not replace subject imports because producers of non-subject imports lacked the capacity to supply the necessary volume to the U.S. market. Such a finding would certainly be relevant to the

causation analysis under <u>Gerald Metals</u>. However, it is the Commission's burden, not the subject importer's, to demonstrate that the subject imports themselves caused the domestic injury. <u>See</u> <u>Gerald Metals</u>, 132 F.3d at 722. In any event, the Commission's decision made no finding on the capacity issue.

III

In short, the Commission's summary finding of material injury is insufficiently detailed to comply with the requirements of <u>Gerald Metals</u>. We therefore vacate and remand the Court of International Trade's decision so that it may remand the case back to the Commission to specifically address whether the non-subject imports would have replaced subject imports during the period of investigation.

In ordering reconsideration by the Commission, we do not suggest that the mere existence of fairly traded commodity imports at competitive prices precludes the Commission from finding material injury. For example, it may well be that non-subject importers lack capacity to replace the subject imports or that the price of the non-subject imports is sufficiently above the subject imports such that the elimination of the subject imports would have benefited the domestic industry. The point is that the Commission has to explain, in a meaningful way, why the non-subject imports would not replace the subject imports and continue to cause injury to the domestic industry.

CONCLUSION

For the foregoing reasons, the decision below is vacated and remanded for further proceedings.

<u>VACATED and REMANDED</u>

## COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

05-1213

BRATSK ALUMINIUM SMELTER, RUAL TRADE LIMITED,
and GENERAL ELECTRIC SILICONES LLC,

Plaintiffs,

and

SUAL HOLDING and ZAO KREMNY,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

GLOBE METALLURGICAL INC. and SIMCALA, INC.,

Defendants-Appellees.

ARCHER, Senior Circuit Judge, dissenting.

The majority states that Gerald Metals, 132 F.3d 716 (Fed. Cir. 1997), "requires the Commission to explain why—notwithstanding the presence and significance of the non-subject imports—it concluded that the subject imports caused material injury to the domestic industry." Maj. op. at 10. While acknowledging that there may be support for the Commission's ultimate determination of material injury in the record here, the majority "find[s] that the Commission did not sufficiently explain its decision in this regard." Id. I disagree.

In my view, the Commission adequately considered the effect of both the subject imports and the interchangeable nonsubject imports on the domestic industry in its

determination and found substantial evidence in the record to support its material injury determination. I would, therefore, affirm the Court of International Trade's judgment sustaining the Commission.

The majority appears to take no issue with the Commission's underlying analysis of whether the domestic industry was in fact harmed. The Commission performed the proper analysis and considered the statutorily enumerated factors. See 19 U.S.C. § 1677(7)(B)(i) (2000).[1] It concluded that the volume and increase in volume of subject imports, both in absolute terms and relative to apparent domestic consumption and production in the United States, supported a finding of material injury determination. The Commission found that 1) the quantity of subject imports increased overall by 35.8% from 1999 to 2001 and by 38.6% from 2000-2001 (after showing a slight decrease from 1999 to 2000); 2) "[t]he continued increase in subject import volume by 57.6 percent between the interim periods resulted in Russia being the largest single source of silicon metal imports in interim 2002"; and 3) from 1999 to 2001 and from 2000-2001 subject imports outpaced all other imports in gaining U.S. market share.

---

[1] Section 1677(7)(B)(i) of Title 19 of the United States Code states that in making a material injury determination the Commission must consider the following factors:

(I) the volume of imports of the subject merchandise,
(II) the effect of imports of that merchandise on prices in the United States for domestic and like products, and
(III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States. . . .

19 U.S.C. § 1677(7)(B)(i).

Given that "price is a key factor in purchasing decisions [to buy silicon metal]", the Commission also concluded that underselling by subject imports supported a material injury determination, "find[ing] that prices have been depressed to a significant degree by the subject imports."  Although nonsubject goods have at times also undersold the domestic product, the Commission found that purchaser price data "show[s] that imports from Russia have been priced at lower levels than nonsubject imports."  Specifically, the Commission noted that imports from Russia undersold South African chemical grade product in all eleven purchaser price comparisons and undersold Brazilian chemical grade product in ten of eleven purchaser price comparisons.  In its price analysis, the Commission "recognize[d] that nonsubject imports may have had an independent price depressive effect on domestic silicon metal prices."  Ultimately, however, the Commission concluded that

> given the significant underselling by subject imports, subject import volume surges during the [period of interest], and the high degree of substitutability between subject imports and the domestic product, . . . the subject imports themselves have significantly depressed domestic silicon metal prices in all three customer segments (i.e., chemical, primary and secondary aluminum customers).

As part of its material injury determination, the Commission specifically addressed the respondents' argument "that there was no causal nexus between subject imports and the injury suffered by the domestic industry because of the presence of interchangeable and readily available nonsubject imports."  The Commission found that "[s]ubject imports registered a 4.8 percentage point market share gain while nonsubject imports lost 2.3 percentage points in market share from 2000 to 2001, the same year that the domestic industry suffered an operating loss for the first time during the [period of interest] and idled, closed, or converted many of its silicon metal production facilities."

Specifically, the Commission explained that Russian imports' share of total imports increased from 7.3% in the first quarter of 2001 to 26.2%, 31.4%, and 40.1%, respectively, in the remaining three quarters of 2001. Similarly, Russian imports' share of total imports was 31.5% in first quarter 2002 and 36.9% in second quarter 2002, before declining to 11.6% in third quarter 2002, following the Commission's and the Department of Commerce's preliminary determinations in this investigation. The Commission also observed that by quantity, nonsubject import volume increased only by 25.8% from interim 2001 to interim 2002, whereas subject import volume increased by 57.6% during the same period.

In view of this data, the Commission concluded that "the fact that nonsubject imports may have contributed to the domestic industry's continued deterioration toward the end of the period, along with subject imports, does not negate our finding that subject imports themselves had a material adverse impact on the domestic industry." This is precisely the causation analysis necessary in view of Gerald Metals. Neither the statute nor Gerald Metals imposes the rigidity in findings or analysis that the majority seems to require. Indeed, the Gerald Metals opinion acknowledges the "unique circumstances" in that case. Gerald Metals, 132 F.3d at 722.

Contrary to the majority's assertion, the Commission here did not "claim that it is not obligated to follow this court's precedent." Maj. op. at 10. Rather, the Commission merely noted that Commission investigations are sui generis and, because of this, its prior investigations may not always form the basis for clear precedent that transcends different fact patterns. When explaining the factual differences between Gerald Metals

(and other similar cases[2]) and the present case, the Commission found significant that in <u>Gerald Metals</u> subject import volume had decreased, both in absolute terms and relative to domestic consumption, during the last <u>full year</u> of the period of interest. These volume trends, explained the Commission, indicated that the significance of LTFV imports diminished during the period of interest, thus suggesting that in <u>Gerald Metals</u> any injury to domestic injury was not by reason of the subject imports. Because of the factual differences between <u>Gerald Metals</u> and the present case, the Commission determined that "respondents' arguments that <u>Gerald Metals</u> precludes an affirmative determination in this investigation [were] unpersuasive."

As summarized above, the Commission performed a proper material injury analysis, including explaining why the subject imports caused material injury to the domestic industry despite the existence of interchangeable nonsubject imports. In fact, the Commission expressly acknowledged its obligation to consider the effect of nonsubject imports in its investigation, citing <u>Gerald Metals</u> and <u>Taiwan Semiconductor</u>:

> We have considered the evidence on nonsubject imports in this investigation and find, notwithstanding the presence of nonsubject imports, that subject imports themselves caused material injury to the domestic industry and did not simply contribute to the injury in a "tangential or minimal way." <u>Gerald Metals</u>, 132 F.3d at 722; <u>Taiwan</u>

---

[2]   For example, in discussing <u>Taiwan Semiconductor Industry Assoc. v. United States</u>, 266 F.3d 1339 (Fed. Cir. 2001), the Commission noted that this court had affirmed the Commission's redetermination. There the Commission found that, throughout the period of investigation, Taiwanese Static Random Access Memory Semiconductor ("SRAMS") market share, both by value and by quantity, had remained relatively flat. The domestic industry's market share, by quantity, declined by about 15% while the market share of nonsubject imports increased by almost that amount. During the years in which the domestic industry suffered its greatest injury, imports from Taiwan frequently oversold U.S. product. Thus, the Commission was simply noting the clear difference between the fact pattern present in <u>Taiwan Semiconductor</u> and the one before it.

<u>Semiconductor Industry Assoc. v. United States</u>, 266 F.3d 1339, 1344 (Fed. Cir. 2001).

I fail to see what more the Commission should be required to do to explain its decision.