**Slip Op. 08-5**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                          :
BRATSK ALUMINUM SMELTER and               :
RUAL TRADE LIMITED                        :
                                          :
            Plaintiffs,                   :
                                          :
            and                           :
                                          :
SUAL HOLDING and ZAO KREMNY, and          :
GENERAL ELECTRIC SILICONES LLC            :
                                          :
            Plaintiff-Intervenors         :
                                          :
            v.                            :   Court No. 03-00200
                                          :
UNITED STATES,                            :
                                          :
            Defendant,                    :
                                          :
            and                           :
                                          :
GLOBE METALLURGICAL INC. and              :
SIMCALA, INC.                             :
                                          :
            Defendant-Intervenors.        :
                                          :
_____

Held: The Remand Determination filed by the International Trade Commission on March 22, 2007, is affirmed in its entirety. As all other issues have been decided, this case is dismissed.

Vorys, Sater, Seymour and Pease LLP (Frederick P. Waite and Kimberly R. Young), for SUAL Holding and ZAO Kremny, plaintiff-intervenors.

James M. Lyons, General Counsel; Andrea C. Casson, Assistant General Counsel, Office of the General Counsel, United States International Trade Commission (June B. Brown), for the United States, defendant.

DLA Piper US LLP (William D. Kramer, Martin Schaefermeier, and James A. Earl), for Globe Metallurgical Inc. and SIMCALA, Inc., defendant-intervenors.

Dated: January 15, 2008

## OPINION

**TSOUCALAS, Senior Judge:** This case is before this Court on remand from the United States Court of Appeals for the Federal Circuit ("CAFC"). See Bratsk Aluminum Smelter v. United States ("Bratsk CAFC"), 444 F.3d 1369 (2006).

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and 28 U.S.C. § 1581(c).

For the reasons explained below, the Court finds that the International Trade Commission's ("ITC") Remand Determination filed on March 22, 2007 (the "Remand Determination") is responsive to the CAFC's mandate in Bratsk CAFC and to this Court's August 17, 2006, remand order (the "Remand Order") and is therefore affirmed in its entirety.[1]

## STANDARD OF REVIEW

The Court will uphold an ITC determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000).

In an administrative review, the court cannot substitute its judgment for that of the ITC when the choice is "between two fairly

---

[1] Unless otherwise noted the term "Remand Determination" herein shall refer to the Public Version of that document filed by the ITC.

conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Am. Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984)(quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

**DISCUSSION**

## I. Abbreviated Background

In antidumping proceedings, the ITC is charged with determining whether an industry in the United States has suffered, or is threatened with, material injury by reason of imports. See 19 U.S.C. § 1673d(b).

On February 11, 2003, the Department of Commerce determined that silicon metal imports from Russia were, or were likely to be, sold in the U.S. at less than fair value ("LTFV"). On March 24, 2003, the ITC published notice that the domestic silicon metal industry was materially injured by reason of subject imports from Russia. See Silicon Metal from Russia, 68 Fed. Reg. 14,260. On March 26, 2003, Commerce published an antidumping duty order on imports of silicon metal from Russia. See Antidumping Duty Order: Silicon Metal from Russia, 68 Fed. Reg. 14,578. Appellants argued to the ITC that the CAFC opinion in Gerald Metals, Inc. v. United States ("Gerald Metals"), 132 F.3d 716 (1997), required a specific determination as to whether the non-subject imports would simply

replace the subject imports with the same impact on the domestic market.  The ITC made no such determination.

On April 25, 2003, plaintiffs Bratsk Aluminum Smelter and RUAL Trade Limited initiated an action before this Court challenging several aspects of the ITC's final determination, including whether the Russian imports caused injury to the domestic industry.  This Court remanded the case to the ITC on an unrelated issue.  In its remand (filed September 15, 2004), the ITC incorporated its initial decision by reference and clarified some of its findings.  On December 3, 2004, this Court affirmed the ITC's remand determination in its entirety and dismissed the case.  See Bratsk Aluminum Smelter v. United States ("Bratsk CIT"), Slip Op. 04-153 (2004).  SUAL Holding and ZAO Kremny appealed this Court's decision.[2]

On April 10, 2006, the CAFC vacated this Court's decision and instructed us to remand the case back to the ITC to "specifically address whether the non-subject imports would have replaced subject imports during the period of investigation." Bratsk CAFC, 444 F.3d at 1376.  The Bratsk CAFC opinion noted that "[t]he sole point of contention in this appeal is whether the Commission established that the injury to the domestic industry was '"by reason of"' the subject imports." Id. at 1372.

---

[2]  Plaintiffs Bratsk Aluminum Smelter and RUAL Trade Limited, filed a notice of dismissal on December 6, 2004, and are not parties to this appeal.

On August 17, 2006, this Court issued its Remand Order according to the CAFC's instructions. The Remand Order further ordered that if the ITC finds material injury where fairly traded commodity imports are competitively priced, the ITC must explain in a meaningful way why the non-subject imports would not replace the subject imports while continuing to cause injury to the domestic industry.

## II. Discussion

### A. ITC Remand Determination Decision

In order to comply with this Court's Remand Order, the ITC, among other things, sent questionnaires to silicon metal producers in seventeen non-subject countries and received responses from foreign producers in four countries and from seven U.S. embassies. See Remand Determination. The ITC also reviewed secondary sources on silicon metal production. The ITC concluded in its Remand Determination, as further described infra, that an industry in the United States is materially injured by reason of imports of silicon metal from Russia (the "subject imports") that the Department of Commerce has found are sold in the U.S. at LTFV. See id.

In completing its Remand Determination and reaching its conclusion, the ITC used the Bratsk CAFC language to fashion a "replacement/benefit test" (i.e., "whether non-subject imports would have replaced the subject imports without any beneficial

effect on domestic producers"). Remand Determination at 12; Bratsk
CAFC, 444 F.3d at 1375. The replacement/benefit test examines
separately the issues of "replacement" and "benefit."[3]

B.    **The ITC's Findings**

(i) Replacement during the period of investigation

The CAFC noted that a finding by the ITC that "non-subject
imports could not replace subject imports because producers of non-
subject imports lacked the capacity to supply the necessary volume
to the U.S. market . . . would certainly be relevant to the
causation analysis under Gerald Metals." Bratsk CAFC, 444 F.3d at
1376.

In assessing whether the non-subject imports would have
replaced subject imports during the period of investigation (POI),
the ITC noted that it considered interchangeability of the product
and the "non-subject producers' capacity to fill any void left by
subject imports . . .[including factors] such as commitments by
non-subject producers under long-term contracts, transportation
costs, or more attractive third-country markets." Remand
Determination at 15-16.

_____

[3] The "benefit" portion of the ITC's replacement/benefit
test, further discussed infra, examines whether, in the words of
the Bratsk CAFC opinion, "the price of the non-subject imports is
sufficiently above the subject imports such that the elimination
of the subject imports would have benefitted the domestic
industry." Bratsk CAFC, 444 F.3d at 1376.

The ITC found that "the evidence is mixed as to whether and to what extent replacement would have occurred." Id. at 16. The data shows that from the second quarter to the third quarter of 2002, subject import volume decreased by 12,400 short tons and non-subject imports volume during the same period increased by 9,225 short tons, from which the ITC concludes that this "evidence suggests some, although not total, replacement of subject imports by non-subject imports over this limited period." Id. at 16-17.

While granting that "non-subject countries theoretically had enough excess capacity and exports to third-country markets to replace the 34,153 short tons of silicon metal from Russia that entered the United States in 2001," the ITC notes that that fact alone does not establish that foreign producers would have replaced the subject imports with non-subject imports.[4] Id. at 17. The ITC cites, for instance, to the U.S. antidumping duty orders on Brazil and China and to a Norwegian and Spanish focus on European markets during the POI as arguing against a conclusion of total replacement. Id. at 17-18.

Given the many variables in this kind of analysis, the ITC does not, and probably cannot, make any definitive statements ultimately as to this POI replacement data. It seems clear,

---

[4] The excess capacity numbers of certain non-subject importers during the POI are included in the Business Proprietary version of the Remand Determination. See Remand Determination (Business Proprietary Version) at 17.

however, that the ITC believes the data likely points to a partial, but not total, replacement of subject imports by non-subject imports.[5]  It is not clear to this Court that the ITC's belief as to this particular point is necessarily justified by the record or merely an expert's educated guess.

(ii) <u>Price benefit</u>

In ordering reconsideration by the ITC, the CAFC clarifies that "the mere existence of fairly traded commodity imports at competitive prices" does not preclude a finding by the ITC of material injury, because "[f]or example, it may well be . . .that the price of the non-subject imports is sufficiently above the subject imports such that the elimination of the subject imports would have benefited the domestic industry." <u>Bratsk CAFC</u>, 444 F.3d at 1376.  In its Remand Determination the ITC focuses on two different measures of price data during the POI - purchaser price data and average unit value ("AUV") data.

(a) Purchaser price data during the POI

The ITC looked at purchaser price data on the largest non-subject import sources as well as on subject imports and the domestic product. <u>See</u> Remand Determination.  The purchaser price data represent certain percentages of the quantity for 2001 of non-subject imports, domestically produced commercial shipments and

---

[5]  The ITC does not specify where along the spectrum of partial to total replacement the non-subject imports replacement of subject imports is likely to fall.

subject imports.  See id. (Business Proprietary Version) at 19-20.

The ITC found that the purchaser price data, covering all three silicon metal sectors,[6] "show that the subject imports undersold the non-subject imports in 42 of 56 comparisons, that the subject imports undersold the domestic product in all comparisons. . . and that the non-subject imports undersold the domestic product in 44 of 56 comparisons."  Id. at 20.

The Court notes that with respect to the fact that both the subject imports and the non-subject imports undersold the domestic product, it is important to examine the respective underselling margin range and underselling margin average figures for both as the ITC has done.  See id. (Business Proprietary Version).


(b) AUV data during the POI

While conceding that AUV data is not as reliable as purchaser price data, the ITC noted "that the AUVs of imports from the individual non-subject countries were always higher on a full-year and interim year basis than the AUVs of imports from Russia." Remand Determination at 20.  The ITC found that on a quarterly basis, with some exceptions, "subject import AUVs were also lower than the AUVs for all non-subject imports."  Id.  The ITC also found that in the chemical sector "the AUVs of the non-subject

---

    [6]  The three silicon metal sectors are secondary aluminum, primary aluminum, and chemical.

imports, while below those of the U.S. product, were higher than those of the subject imports throughout the period investigated." Id. at 20-21.

The ITC concludes that the purchaser price and AUV data on the record shows that "non-subject imports consistently oversold the subject imports from Russia" and that "even if the non-subject imports replaced some of the subject imports, the domestic industry would nonetheless have derived a price benefit from imposition of the order [as] [h]igher prices would have provided some relief to the domestic industry . . . in that domestic producers would have been able to raise their prices to some degree or at least maintain prices rather than suffer price declines."  Id. at 21.

(c) Post-POI data

The Bratsk CAFC opinion noted that the fact that "spot prices may have increased after the Russian imports exited the market may be pertinent to the causation question" but added that this did not "excuse the [ITC's] failure to address the causation issue in detail as required by Gerald Metals."  Bratsk CAFC, 444 F.3d at 1375-76.  The CAFC also noted that the ITC "did not explain how much the spot prices increased, the significance of that increase, or the significance of the [eleven domestic contracts which increased] for the domestic market." Id. at 1376.

The ITC notes that it does not base its finding of material injury on the post-POI data, but in reviewing that data they "find that it is consistent with our affirmative determination and with

our conclusion. . . that the domestic industry would have benefited from imposition of an order on the subject imports." Remand Determination at 22.

The ITC found that the data shows that "U.S. producers made both spot and contract sales at higher prices and were able to expand their volume of sales after subject imports left the market." Id. The ITC noted that this rise in contract and spot prices, along with increased sales volumes, allowed domestic producers to restart furnaces shut down due to lack of orders at prices sufficient to cover operating costs. See id. (Business Proprietary Version) at 23. The ITC adds that certain independent industry sources agreed with their conclusion that the recovery in silicon metal spot prices can be attributed to the preliminary antidumping duties. Id.

The Remand Determination contains data showing significant post-POI increases in both volume and price by the domestic producers in spot and contract sales after subject imports left the market and restarting furnaces is a testament to such increases. See id. (Business Proprietary Version) at 22-23.

The Court finds that the ITC has, as requested of it, adequately explained the extent that the spot prices increased, the significance of those increases, and the significance of the domestic contract increases for the domestic market.

C.    **Analysis**

The Court will address the ITC's Remand Determination in the same section by section manner as laid out in the document itself. First, the Court finds that the POI replacement data compiled and analyzed by the ITC for the Remand Determination alone would not have passed the more stringent causation standard required by the CAFC under a Gerald Metals/Bratsk scenario.[7] While it is fairly clear that some replacement of subject imports by non-subject imports would have occurred, it is impossible to say at what point between partial and total replacement the line would have been drawn. Therefore, it is equally impossible to know solely based on this data whether or not the non-subject imports would have replaced the subject imports without any beneficial effect in terms of an increase in sales volume for domestic producers.

Second, the Court finds that the data compiled and analyzed by the ITC on POI price benefits to the domestic industry, while perhaps not dispositive in and of itself, is strongly indicative as to causation. The purchaser price data and AUV data the ITC has assembled indicates a clear, albeit not total, pattern of

_____

[7] The CAFC wrote that "[m]aterial injury determinations are particularly difficult where the imports sold at LTFV compete with identical imports not sold at LTFV." Bratsk CAFC, 444 F.3d at 1371. Accordingly, the CAFC held that when the Gerald Metals circumstances prevail (i.e., "the antidumping investigation is centered on a commodity product, and price competitive non-subject imports are a significant factor in the market"), the ITC is "required to make a specific causation determination and in that connection to directly address whether non-subject imports would have replaced the subject imports without any beneficial effect on domestic products." (Emphasis added). Bratsk CAFC, 444 F.3d at 1375.

significant underselling during the POI by the subject imports from Russia when compared to both the non-subject imports and the domestic product. The subject imports underselling data is significant, both as to the total instances of underselling in the head-to-head price comparisons (as referenced supra, the subject imports undersold the non-subject imports in 42 of 56 comparisons and undersold the domestic product in all comparisons) and as to the extent of the underselling (i.e., the underselling margin range and underselling margin average figures of those price comparisons). In sum, the data supports the ITC's conclusion that even if the non-subject imports replaced some of the subject imports, the domestic industry would nonetheless have derived a price benefit from imposition of the antidumping duty order.

Finally, further bolstering the ITC's conclusion, the post-POI data for the domestic producers exhibits significant increases in spot sales, contract sales and sales volume and may be interpreted as a strong indication of a true and substantial benefit to the domestic industry resulting from Commerce's preliminary affirmative determination. The stronger domestic numbers, following as they did the preliminary determination, appear to show a direct and real world cause and effect relationship, and are therefore more valuable than if they were merely the product of a statistical or theoretical model or of an educated guess on the part of the ITC.

The Court finds therefore that the ITC has addressed the causation issue specifically and in detail as required by Gerald

Metals and Bratsk CAFC and that the POI price data when taken together with the post-POI data adequately supports the conclusions that the ITC has made as to a tangible and significant benefit accruing to the domestic industry, at minimum as to price relief and very likely (as the post-POI data would appear to attest) as to some increased sales volume, from imposition of the order.

As requested of the ITC in this Court's Remand Order of August 17, 2006, the Court finds that (1) the ITC has met its obligation to specifically address whether the non-subject imports would have replaced subject imports during the POI; and (2) having found material injury where fairly traded commodity imports are competitively priced, the ITC has explained in a meaningful way why the non-subject imports would not replace the subject imports while continuing to cause injury to the domestic industry. Accordingly, this Court is satisfied that the ITC has demonstrated that the injury to the domestic industry was by reason of the subject imports.

**CONCLUSION**

The Court holds that the Remand Determination filed by the ITC is responsive to the CAFC's mandate in <u>Bratsk CAFC</u> and thus is affirmed in its entirety.  Judgment will be entered accordingly.


<u>/s/ Nicholas Tsoucalas</u>
NICHOLAS TSOUCALAS
SENIOR JUDGE


Dated:      January 15, 2008
            New York, New York