Slip Op. 06-168

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                  :
SICHUAN CHANGHONG ELECTRIC        :
CO., LTD.,                        :
                                  :
          Plaintiff,              :
                                  :
     and                          : Before: Richard K. Eaton, Judge
                                  :
APEX DIGITAL, INC. and            : Court No. 04-00266
TCL CORP.,                        :
                                  : Public Version
          Pl.-Ints.,              :
                                  :
     v.                           :
                                  :
UNITED STATES,                    :
                                  :
          Defendant,              :
                                  :
     and                          :
                                  :
FIVE RIVERS ELECTRONICS           :
INNOVATION, LLC, INDUSTRIAL       :
DIVISION OF THE COMMUNICATION     :
WORKERS OF AMERICA (IUE-CWA)      :
and INTERNATIONAL BROTHERHOOD     :
OF ELECTRICAL WORKERS,            :
                                  :
          Deft.-Ints.             :
_____:


OPINION AND ORDER

[United States International Trade Commission's Final
Determination remanded.]


                              Dated: November 15, 2006


*Wiley, Rein & Fielding, LLP* (*Charles Owen Verrill, Jr.* and
*Timothy C. Brightbill*), for plaintiff.

*McDermott, Will & Emery, LLC* (*Raymond Paul Paretzky*), for plaintiff-intervenor TCL Corp.

*O'Melveny & Myers, LLP* (*Veronique Lanthier*), for plaintiff-intervenor Apex Digital, Inc.

*James M. Lyons*, General Counsel, United States International Trade Commission; *Robin L. Turner*, Acting Assistant General Counsel, United States International Trade Commission (*Marc A. Bernstein*), for defendant.

*Kelley Drye Collier Shannon, PLLC* (*Mary Tuck Staley*), for defendant-intervenors.


Eaton, Judge:  Before the court is plaintiff Sichuan Changhong Electric Co., Ltd.'s ("Changhong" or "plaintiff") motion for judgment upon the agency record pursuant to USCIT Rule 56.2.  By its motion, Changhong contests the final affirmative material injury determination of the United States International Trade Commission (the "Commission" or "ITC") in the antidumping duty investigation concerning certain color television receivers ("CTVs") from the People's Republic of China ("PRC").[1]  *See* Certain Color Television Receivers From China, USITC Pub. 3695, Inv. No. 731-TA-1034 (Final) (May 2004), List 2, Doc. 426 ("Final Determination"); Certain Color Television Receivers From China, 69 Fed. Reg. 31,405 (ITC June 3, 2004).  The court has

---

[1]    As a manufacturer and exporter of CTVs subject to the ITC's final determination, Changhong is an "interested party" within the meaning of 19 U.S.C. § 1677(9)(A) (2000) and is thus entitled to challenge the determination.

jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(i) (2000).  For the reasons that follow, the court remands the Final Determination.


BACKGROUND

On May 2, 2003, the International Brotherhood of Electrical Workers, the Industrial Division of the Communication Workers of America (IUE-CWA) and Five Rivers Electronics Innovation, LLC filed an antidumping duty petition alleging that the United States CTV industry was being materially injured and was threatened with further material injury by reason of less than fair value ("LTFV") imports of CTVs from the PRC and Malaysia.[2] List 1, Doc. 1.  Based on the information contained in the petition, the Commission instituted an antidumping duty investigation.  Certain Color Television Receivers From China and Malaysia, 68 Fed. Reg. 25,627 (ITC May 13, 2003).  A conference

---

[2]    The United States Department of Commerce's ("Commerce") investigation was initiated for both Malaysia and the PRC. Certain Color Television Receivers From Malaysia and the PRC, 68 Fed. Reg. 32,013 (ITA May 29, 2003).  As a result of the investigation, Commerce determined that imports from Malaysia were not sold at LTFV.  Certain Color Television Receivers From Malaysia, 69 Fed. Reg. 20,592 (ITA Apr. 16, 2004).  The Commission terminated its investigation with respect to CTVs from Malaysia, effective April 16, 2004.  Certain Color Television Receivers From Malaysia, 69 Fed. Reg. 22,093 (ITC Apr. 23, 2004). As such, imports from Malaysia are not the subject of this litigation.

in connection with the investigation was held on May 23, 2003, and all persons requesting the opportunity were permitted to appear. Certain Color Television Receivers From China and Malaysia, 68 Fed. Reg. 38,089 (ITC June 26, 2003) (prelim.). Interested parties filed briefs on May 29, 2003. *See, e.g.*, List 2, Docs. 42-46. On the basis of the record developed in the investigation, the ITC preliminarily determined that there was a "reasonable indication that an industry in the United States [was] materially injured by reason of imports" of the subject merchandise. 68 Fed. Reg. at 38,089.

Following its preliminary determination, the ITC published a schedule for the final phase of its investigation. Certain Color Television Receivers From China and Malaysia, 69 Fed. Reg. 3601 (ITC Jan. 26, 2004) ("Scheduling Notice"). Issued on January 20, 2004, the Scheduling Notice established a timetable for the remainder of the ITC's investigation: (1) "The prehearing staff report . . . will be placed in the nonpublic record on April 1, 2004"; (2) "The Commission will hold a hearing . . . on April 15, 2004 . . . . Requests to appear . . . should be filed . . . on or before April 7, 2004"; (3) "Each party who is an interested party shall submit a prehearing brief to the Commission . . . . [T]he deadline for filing is April 8, 2004"; (4) "The deadline for filing posthearing briefs is April 22, 2004"; (5) "On

May 7, 2004, the Commission will make available to parties all information on which they have not had an opportunity to comment"; (6) "Parties may submit final comments on this information on or before May 11, 2004, but such final comments must not contain new factual information and must otherwise comply with section 207.30 of the Commission's rules." *Id.* at 3601-02.

The Commission conducted its investigation according to the Scheduling Notice. Interested parties submitted questionnaire responses and pre-hearing briefs in March and April 2004. On April 15, 2004, the ITC held a day-long hearing where several parties presented testimony. The arguments made at the hearing prompted a reevaluation of the record information documenting the domestic industry's financial performance. This reevaluation led the Commission to conclude that it lacked the most recent financial data relating to the domestic industry. On April 21, 2004, Commission staff sent e-mail messages to domestic producers of CTVs whose fiscal years ended on March 31, 2003, asking for updated financial data for calendar year 2003. List 2, Docs. 308, 309, 313, 314. On April 29 and May 4, 2004, the domestic producers furnished the ITC with the requested information ("updated financial information"). In the aggregate, the

domestic producers' submissions averaged under ten pages in length.  List 2, Docs. 324, 325, 326, 336.

On May 6, 2004, the Commission placed on the record a memorandum, which contained a one-page digest of the updated financial information provided by the domestic CTV producers. List 2, Doc. 398.  In accordance with the dates in the Scheduling Notice, the updated financial data was released to the parties, including Changhong, on May 7, 2004.  Changhong and the other Chinese respondents filed their final comments on the updated financial information on May 11, 2004.  List 2, Doc. 407. Pursuant to Commission regulations, the parties' final comments were not to exceed fifteen pages.  19 C.F.R. § 207.30(b) (2004). Changhong submitted ten pages of comments, of which one and one-quarter pages discussed the updated financial information.  List 2, Doc. 407 at 6-7.  On May 27, 2004, on the basis of the record developed in the investigation, the ITC determined that "an industry in the United States is materially injured by reason of imports of certain color television receivers from China that are sold in the United States at less than fair value . . . ."  Final Determination at 3.

STANDARD OF REVIEW

When reviewing a final determination in an antidumping or countervailing duty investigation, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is more than a mere scintilla." *Consol. Edison*, 305 U.S. at 229. The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin*, 322 F.3d at 1374 (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

DISCUSSION

A.   Changhong's Due Process Claim

Changhong argues that the ITC deprived it of a right to "participate meaningfully" in the ITC's investigation. Pl.'s

Conf. Revised Br. Supp. Mot. J. Agency R. ("Pl.'s Supp. Br.") at 4.  Changhong styles this claim as a due process violation, but it does not challenge the constitutionality of either the antidumping statute or the Commission's regulations, nor does it contend the ITC failed to comply with its regulations.  Pl.'s Revised Conf. Reply Br. ("Pl.'s Reply") at 4 ("Changhong has never claimed that the ITC did not comply with its regulations.").

In its opening brief, Changhong claims that "[b]ecause [it] was given only four days to review and comment on [the updated financial] information, it had no real opportunity to analyze the information, conduct further research, and develop and submit its own information and arguments in response."  Pl.'s Supp. Br. at 10 (emphasis omitted).  In its reply brief, however, Changhong seems to retreat from this position and argues instead that the "issue is not whether [it] should have been accorded more time to comment on the information, but whether its inability to submit new factual information prejudiced its ability to make meaningful comments."  Pl.'s Reply at 5-6.  Changhong asserts that the updated financial information was important to the ITC's finding that the profitability of the domestic industry decreased between 2001 and 2003, and that it was prejudiced by not having the opportunity to submit new factual information of its own to show

that "declining production and profitability in the domestic industry was a consequence of [a] shift to non-subject countries . . . ." Pl.'s Supp. Br. at 14. Changhong thus seeks a remand to the Commission with instructions to permit the parties to "submit new factual information" on the domestic industry's financial condition in 2003 and the first quarter of 2004. Pl.'s Reply at 9. The court shall address both of Changhong's arguments.

It is well established that "[t]he fundamental requisite of due process of law is the opportunity to be heard." *Grannis v. Ordean*, 234 U.S. 385, 394 (1914) (citations omitted). In order to succeed in its due process claim, then, Changhong must show that its opportunity to be heard was unreasonably curtailed. *See Borden, Inc. v. United States*, 23 CIT 372, 375 n.3 (1999), *rev'd on other grounds*, 7 Fed. Appx. 938 (Fed. Cir. 2001).

Here, the primary basis for Changhong's due process claim is that it was denied a meaningful opportunity to participate in the administrative proceeding by having only four days to review and comment on the updated financial information and by not being permitted to submit new factual information. Pl.'s Supp. Br. at 10. This Court has stated that, at a minimum, the ITC must adhere "to the procedures which Congress has set out in the statutes and [the ITC] has implemented in regulations." *PPG*

*Indus., Inc. v. United States*, 13 CIT 183, 190, 708 F. Supp.

1327, 1332 (1989), *aff'd*, 978 F.2d 1232 (Fed. Cir. 1992).[3]

The statutory and regulatory provisions relevant to

Changhong's claim are set forth in 19 U.S.C. § 1677m(g) and 19

C.F.R. § 207.30.  Subsection 1677m(g) of the antidumping statute,

entitled "Public comment on information," provides:

> Information that is submitted on a timely
> basis to the administering authority or the
> Commission during the course of a proceeding
> under this subtitle shall be subject to
> comment by other parties to the proceeding
> within such reasonable time as the
> administering authority or the Commission
> shall provide.  The administering authority
> and the Commission, before making a final
> determination under section 1671d, 1673d,
> 1675, or 1675b of this title shall cease
> collecting information and shall provide the
> parties with a final opportunity to comment
> on the information obtained by the
> administering authority or the Commission (as
> the case may be) upon which the parties have
> not previously had an opportunity to comment.
> Comments containing new factual information
> shall be disregarded.

---

[3]    Changhong relies heavily on the *PPG Industries* case, where
the court remanded the matter to Commerce to reopen and
supplement the record with a document Commerce stated it had
relied upon in making its determination, but which the parties
had neither seen nor commented upon prior to the litigation
before this Court.  Pl.'s Supp. Br. at 10-11.  On remand, the
parties were permitted to review and comment on the omitted
document.  Here, it is undisputed that the updated financial
information relied upon by the ITC was placed on the record and
was the subject of comment by the parties.  Thus, *PPG Industries*
is of no benefit to Changhong.

19 U.S.C. § 1677m(g). The regulation that implements this provision expands upon § 1677m(g)'s instruction to afford the parties advance notice of the time within which to comment upon information submitted to, or collected by, the ITC. Section 207.30 provides that "the Commission shall specify a date on which it will disclose to all parties . . . all information it has obtained on which the parties have not previously had an opportunity to comment." 19 C.F.R. § 207.30(a). Subsection (b) of the regulation provides:

> The parties shall have an opportunity to file comments on any information disclosed to them after they have filed their posthearing brief . . . . Comments shall only concern such information, and shall not exceed 15 pages of textual material . . . . A comment may address the accuracy, reliability, or probative value of such information by reference to information elsewhere in the record . . . . Comments containing new factual information shall be disregarded.

19 C.F.R. § 207.30(b). Like the statute it implements, § 207.30 provides that parties will have an opportunity to comment on previously undisclosed information following the filing of their post-hearing briefs. The statute's requirement that the Commission disregard new factual information is reiterated in the regulation by its statement that the comments themselves may only address the "accuracy, reliability, or probative value" of

information on the record by reference to information already present elsewhere in the record.

There is no dispute that the ITC complied with the relevant statute and regulations. Indeed, as noted above, Changhong concedes as much. Pl.'s Reply at 4. The ITC provided the parties, including Changhong, an opportunity to comment on the updated financial information as provided in the Scheduling Notice. Scheduling Notice, 69 Fed. Reg. at 3602 ("On May 7, 2004, the Commission will make available to parties all information on which they have not had an opportunity to comment. Parties may submit final comments on this information on or before May 11, 2004 . . . ."). Changhong did, in fact, avail itself of the opportunity and submitted comments on May 11, 2004.

In its initial papers, Changhong expends considerable argument on the amount of time afforded it to comment on the updated financial information. Pl.'s Supp. Br. at 5, 6-12 ("Changhong was given access to this information only four days before the Commission closed the record . . . depriving Changhong of any meaningful opportunity to analyze or rebut this information . . . ."). Changhong essentially argues that had it had more time to prepare comments on the updated financial information, it potentially could have found holes in the data and rebutted the usefulness of the information more successfully.

Rather than point to the specific information with which it would have found fault, however, plaintiff merely asserts that "[w]ith a reasonable amount of time, Changhong could have at least attempted to develop information addressing" the factual issues allegedly raised by the updated financial information. *Id*. at 16.

This argument, of course, could be made in nearly any investigation. With more time most parties could improve the quality of their comments. Nonetheless, the Commission complied with the statute and its regulations, which provide for an opportunity to comment while bringing an investigation to an orderly end. In addition, the ITC maintained the schedule it had established from the first, and Changhong did, in fact, submit comments on the new data. Finally, there is no evidence that given more time Changhong would have, in fact, provided more meaningful comments.

Nor can Changhong make a claim of prejudice based on its alleged "inability to submit new factual information . . . ." Pl.'s Reply at 5. When an investigation is coming to a close, the antidumping statute specifically directs the Commission to disregard new factual information. 19 U.S.C. § 1677m(g). The implementing regulation echoes this restriction and further directs that the final comments themselves may not reference new

factual information, but only that information already in the record. 19 C.F.R. § 207.30(b). This Court has found that limiting the submission and consideration of new factual information is reasonable because an agency "clearly cannot complete its work unless it is able at some point to 'freeze' the record and make calculations and findings based on that fixed and certain body of information." *Böwe-Passat v. United States*, 17 CIT 335, 339 (1993) (not published in the Federal Supplement).

For the foregoing reasons, the court finds that the four-day period in which Changhong could submit final comments conformed to its long-established schedule and provided an adequate period for the submission of comments, which Changhong took advantage of. In addition, the statutory and regulatory provisions set forth in 19 U.S.C. § 1677m(g) and 19 C.F.R. § 207.30 are a reasonable means to bring an administrative procedure to closure.

B. Changhong's Causation Claim

Next, Changhong challenges the ITC's finding that subject imports caused material injury to the domestic industry.[4] Changhong contends that "[t]he Commission failed to consider

---

[4]    Changhong does not contest the ITC's volume, price effects and impact determinations, made pursuant to 19 U.S.C. § 1677(7)(C)(i)-(iii), which form the basis of the ITC's materiality finding.

other factors that affected the performance of the U.S. industry, especially the impact of non-subject imports, and so failed in its duty to ensure that injury from other factors was not attributed to the subject imports."  Pl.'s Supp. Br. at 16-17. In particular, it asserts that the ITC failed to "assess . . . sufficiently . . . whether [non-subject imports from Thailand] . . . severed the causal connection between the subject imports and injury."  Pl.'s Reply at 12-13.

To make an affirmative material injury determination, the ITC must find both "(1) present material injury and (2) a finding that the material injury is 'by reason of' the subject imports." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 719 (Fed. Cir. 1997) (citation omitted).  With respect to the latter finding, the United States Court of Appeals for the Federal Circuit has held that "[a]s long as its effects are not merely incidental, tangential or trivial, the foreign product sold at less than fair value meets the causation requirement."  *Nippon Steel Corp. v. United States Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003) (citation omitted).  In determining causation, "the Commission must analyze 'contradictory evidence or evidence from which conflicting inferences could be drawn' . . . to ensure that the subject imports are causing the injury, not simply contributing to the injury in a tangential or

minimal way." *Taiwan Semiconductor Indus. Ass'n v. United States*, 266 F.3d 1339, 1344 (Fed. Cir. 2001) (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994); citing *Gerald Metals*, 132 F.3d at 722). In other words, the ITC "must distinguish between harm that is caused by imports and harm that is caused by other factors; in determining injury, it cannot attribute to imports the impact of other factors." *Altx, Inc. v. United States*, 370 F.3d 1108, 1120 (Fed. Cir. 2004) (citation omitted).

In keeping with these injunctions, cases have expanded on the necessary inquiry the ITC must conduct by holding that, under certain circumstances, the ITC must consider the effects of non-subject imports. *See Bratsk Aluminium Smelter v. United States*, 444 F.3d 1369, 1373 (Fed. Cir. 2006) ("Where commodity products are at issue and fairly traded, price competitive, non-subject imports are in the market, the Commission must explain why the elimination of subject imports would benefit the domestic industry instead of resulting in the non-subject imports' replacement of the subject imports' market share without any beneficial impact on domestic producers."); *Caribbean Ispat, Ltd. v. United States*, 450 F.3d 1336, 1341 (Fed. Cir. 2006) (remanding to ITC for further consideration where ITC had found "high level of fungibility" between subject and non-subject imports but had

not addressed whether non-subject imports would replace subject imports without any beneficial effect on the domestic industry); *Gerald Metals*, 132 F.3d at 720 (remanding where subject and non-subject Russian imports of pure magnesium were "perfect substitutes"). Thus, to sustain a finding of material injury, the court must (1) be able to discern how the Commission ensured that it did not attribute the injury from other sources to the subject imports; and as shall be seen, (2) under certain circumstances, be able to determine that, following issuance of an antidumping order, the injury would not continue by reason of non-subject imports. *Taiwan Semiconductor Indus. Ass'n v. United States*, 23 CIT 410, 416, 59 F. Supp. 2d 1324, 1330-31 (1999), *aff'd*, 266 F.3d 1339 (Fed. Cir. 2001); Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-826(I), at 851-52 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4184-85; *Bratsk*, 444 F.3d at 1373.

Here, the ITC did take into account non-subject imports in making its volume, price effects and impact determinations under 19 U.S.C. § 1677(7)(B). *See, e.g.*, Conf. Staff Report at E-6-7 & Tbls. E-12, II-3, II-4, IV-2, IV-4, IV-5, V-2, V-4, V-5 & V-6. Nonetheless, as discussed *infra* in section B(4), the court finds remand appropriate, in light of the Federal Circuit's holdings in *Bratsk* and *Caribbean Ispat*, which were issued after the Final

Determination was made.  A brief description of the findings made

by the Commission will illustrate why this remand is appropriate.


     (1)  *Volume*

     The ITC concluded that under 19 U.S.C. § 1677(7)(C)(i), "the

volume and increase in volume of subject imports, both in

absolute terms and relative to consumption in the United States,

[were] significant."  Final Determination at 22; 19 U.S.C.

§ 1677(7)(C)(i).  In its volume analysis, the ITC found that

between 2001 and 2003 the record evidence showed increases in the

total quantity of subject imports,[5] U.S. shipments of subject

imports[6] and the share of apparent U.S. consumption represented

by U.S. shipments of subject imports.[7]  Final Determination at

19-20.

---

[5]     "[T]he quantity of subject imports increased from 56,000
units in 2001 to 1.3 million units in 2002 and then to 1.8
million units in 2003."  Final Determination at 19 (citing Conf.
Staff Report, Tbl. IV-2).

[6]     United States shipments of subject imports increased from [[
     ]] units in 2001 to [[          ]] in 2002 and then to [[
          ]] in 2003.  Final Determination at 19 (citing Conf.
Staff Report, Tbl. IV-3).

[7]     The share of apparent U.S. consumption represented by
subject imports increased from [[     ]] percent in 2001 to [[
   ]] percent in 2002 and then to [[      ]] percent in 2003.
Final Determination at 19-20 (citing Conf. Staff Report, Tbl. IV-
5).

The ITC also considered non-subject imports.  This consideration is evident in its findings with respect to market share.  The ITC found that the "subject imports gained market share at the expense of both the domestic industry and nonsubject imports . . . in some of the most significant CTV size ranges." Final Determination at 20.  For example, the ITC examined analog direct-view CTVs with a 4 x 3 aspect ratio in size ranges: 27 to 30 inches; 24 to 25 inches; and the combined category of 24 to 30 inches.  *Id*. at 20-22.  In these size ranges, the quantity of shipments of subject imports and the share of total U.S. shipments represented by the subject imports increased.  Non-subject import measures, however, decreased.  Specifically, non-subject imports from Mexico decreased in absolute terms, and the share of total shipments represented by non-subject imports and the domestically produced product declined as well.  *Id*. at 20-22 (citing Conf. Staff Report at E-6-7 & Tbl. E-12).  After considering the record evidence regarding subject and non-subject imports, the Commission concluded that the increase in subject import volume, in absolute terms and relative to apparent consumption, was significant.

    (2)  *Price Effects*

    Next, with respect to price effects, the ITC concluded that
"there has been significant price underselling by the subject
imports and that the effect of such imports has been to depress
prices for the domestic like product to a significant degree."
Final Determination at 27; 19 U.S.C. § 1677(7)(C)(ii)(I)-(II).
In its price effects analysis, the ITC considered underselling
and price depression, as required by § 1677(7)(C)(ii)(I)-(II).
It found that the subject imports undersold the domestic like
product in 26 out of 28 comparisons.  Final Determination at 23
(citing Conf. Staff Report, Tbls. V-2, V-4, V-5 & V-6).

    In determining the significance of the observed underselling
by subject imports, the ITC considered data showing that non-
subject imports from Mexico also frequently undersold the
domestic like product.  The ITC further noted that "subject
imports from China also undersold imports from Mexico in 16 of 23
quarterly comparisons."  *Id*.  The non-subject data collected
permitted a comparison of quarterly prices of imports from Mexico
and Malaysia, which indicated "[p]rices for subject imports were
lower than prices for nonsubject imports from any source in 14 of
28 quarterly observations.  Thus, the pricing data . . . show
that subject imports were frequently the lowest-priced products

in the market."  *Id*. (citing Conf. Staff Report, Tbls. V-2, V-4, V-5 & V-6).

The ITC found that U.S. CTV prices declined during the period of investigation and that "the subject imports, frequently the lowest-priced product in the market, were a significant cause of price declines."  Final Determination at 25.  Questionnaire responses submitted by CTV purchasers indicated that price was a "very important" factor in their purchasing decisions.  *Id*. at 16 (noting 26 of 30 purchasers indicated price as "very important" factor; citing Conf. Staff Report, Tbl. II-15).  In light of the price competition found to exist among CTVs, the ITC sent questionnaires to domestic producers, importers and purchasers, asking them to attribute the cause of U.S. CTV price declines to imports from specific countries.  Conf. Staff Report, Tbls. II-3 & II-4.  "On average, producers attributed 73 percent of this cause of price decline to subject imports, importers 50 percent, and purchasers 56 percent."  Final Determination at 25 (citing Conf. Staff Report, Tbl. II-4).  The ITC found that "the subject imports have had significant price-depressing effects on prices for the domestic like product."  *Id*. at 26.

   (3)  *Impact*

     Finally, with respect to impact, the ITC "conclud[ed] that the subject imports have had a significant adverse impact on the domestic CTV industry."  Final Determination at 33; 19 U.S.C. § 1677(7)(C)(iii).  The ITC considered the factors enumerated in the statute.[8]  The ITC found the record evidence showed declines in output related indicators.  For example, production, capacity

---

[8]     Subsection 1677(7)(C)(iii) lists the following economic factors, which the ITC must consider in the context of the business cycle and conditions of competition of the affected industry:

>           (I) actual and potential decline in output,
>           sales, market share, profits, productivity,
>           return on investments, and utilization of
>           capacity,
>
>           (II) factors affecting domestic prices,
>
>           (III) actual and potential negative effects
>           on cash flow, inventories, employment, wages,
>           growth, ability to raise capital, and
>           investment,
>
>           (IV) actual and potential negative effects on
>           the existing development and production
>           efforts of the domestic industry, including
>           efforts to develop a derivative or more
>           advanced version of the domestic like
>           product, and
>
>           (V) in a proceeding under part II of this
>           subtitle, the magnitude of the margin of
>           dumping.

19 U.S.C. § 1677(7)(C)(iii).

utilization and the domestic industry's share of U.S. apparent consumption declined in the face of overall increases in capacity and apparent U.S. consumption.  Final Determination at 28 (citing Conf. Staff Report, Tbl. III-6).[9]

The ITC's findings with respect to the volume and market penetration of the subject imports, adverse price effects of the subject imports and "the causal linkage between the subject imports and the domestic industry's declines in output, market share, employment, and operating performance" led to the ITC's conclusion that the "subject imports have had a significant adverse impact on the domestic CTV industry."  *Id*. at 33.

(4) *Consideration of Non-Subject Imports*

The court finds Changhong's argument that the ITC did not consider record evidence pertaining to non-subject imports from Thailand, to be without merit.  While the Final Determination specifically discussed non-subject imports from Mexico, the staff

---

[9]    In addition, the ITC expressly addressed the respondents' argument that "declines in the domestic industry's domestic shipments of CTVs were . . . offset by increases in the domestic producer's shipments of non-[cathode ray tube] televisions," finding that the decline in the domestic industry's CTV shipments was many times greater than the increase in domestic producers' U.S. shipments of non-cathode ray tube televisions during the period of investigation.  Final Determination at 30 (citing Conf. Staff Report, Tbl. E-13).

report contains information about Thai, Korean, Malaysian and other non-subject imports.[10]  *See, e.g.*, Conf. Staff Report, Tbl. IV-2.  It is presumed that the ITC considered all of the evidence placed before it, and here, the ITC clearly considered non-subject imports from a number of countries in reaching its causation determination.  *Nat'l Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771, 779, 696 F. Supp. 642, 648 (1988) ("[A]bsent some showing to the contrary, the Commission is presumed to have considered all of the evidence in the record.") (citations omitted).  "This is especially true where the facts allegedly ignored were presented to the Commission at an open hearing," as facts pertaining to Thailand were here.  *Id.*; *see, e.g.*, Tr. Public Hearing at 169, 178, 206, 221; Pl.'s Supp. Br. at 24 ("In this case, Changhong and the other Chinese producers presented detailed arguments regarding the impact of non-subject imports on the domestic industry." (citations to record omitted)).

---

[10]    The ITC specifically discussed non-subject imports from Mexico in the Final Determination.  It is undisputed that Mexico was the largest source of non-subject imports during the period of investigation.  Pl.'s Supp. Br. at 20 & Tbl. 1 at 17; Def.'s Opp'n Mem. at 22.  The ITC explained that subject imports were priced lower than not only the domestic like product but also non-subject imports.  Final Determination at 23 ("[S]ubject imports from China also undersold imports from Mexico in 16 of 23 quarterly comparisons.").

It is apparent that the ITC took the necessary steps to ensure that it did not attribute injury caused by non-subject imports to the subject imports. To the extent Federal Circuit precedent requires the ITC to make "a specific causation determination and in that connection to directly address whether non-subject imports would have replaced the subject imports without any beneficial effect on domestic producers," however, the court finds remand appropriate. *Bratsk*, 444 F.3d at 1375; *Caribbean Ispat*, 450 F.3d at 1341. In doing so the court recognizes that in *Bratsk* and *Caribbean Ispat*, the subject imports were found to be highly fungible, price-sensitive commodities that could be replaced by non-subject imports without benefit to the domestic industry. Here, there has been no showing that CTVs are "commodity products," nor has the ITC made a finding of "high fungibility" among subject and non-subject imports. Thus, it may be that the analysis the court required in those cases does not apply here. Nonetheless, because the Final Determination was issued before the Federal Circuit's decisions in *Bratsk* and *Caribbean Ispat*, the court remands this matter to the ITC to explain (1) whether the "specific causation determination" required in those cases applies here; and (2) whether the Final Determination otherwise complies with the Federal Circuit's requirements in making its causation

determination.  If the ITC finds its causation analysis deficient in any respect in light of *Bratsk* and other Federal Circuit case law, it must adjust its analysis accordingly.


                              CONCLUSION

     For the foregoing reasons, the court remands the matter to the ITC.  Remand results are due on February 7, 2007, comments are due on March 9, 2007, and replies to such comments are due on March 20, 2007.


                                   /s/ Richard K. Eaton
                                        Richard K. Eaton, Judge


Dated:     November 15, 2006
           New York, New York