Slip Op. 10-48

# UNITED STATES COURT OF INTERNATIONAL TRADE

——————————————————————————  :
                                                              :
MID CONTINENT NAIL CORPORATION,                               :
DAVIS WIRE CORPORATION, MAZE NAILS                            :
(DIVISION OF W.H. MAZE COMPANY) and                           :
TREASURE COAST FASTENERS, INC.,                               :
                                                              :
          Plaintiffs,                  :
      v.                                    :   Before: Jane A. Restani, Chief Judge
                                                              :
UNITED STATES,                                                :   Court No. 08-00225
                                                              :
          Defendant,                   :   **Public Version**
                                                              :
          and                          :
                                                              :
ILLINOIS TOOL WORKS, INC. and PASLODE                         :
FASTENERS (SHANGHAI) CO., LTD.,                               :
                                                              :
          Defendant-Intervenors.      :
                                                              :
——————————————————————————  :

## OPINION

[Plaintiffs' motion for judgment on the agency record in targeted dumping case is denied and judgment is entered for the defendant.]

Dated: May 4, 2010

      Wiley Rein, LLP (Adam Henry Gordon and Maureen Elizabeth Thorson) for the plaintiffs.

      Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (David F. D'Alessandris); Office of Chief Counsel for Import Administration, U.S. Department of Commerce (William G. Isasi, Hardeep K. Josan and Brian Soiset), of counsel, for the defendant.

      McDermott, Will & Emery, LLC (David John Levine) for the defendant-intervenors.

Restani, Chief Judge: This court action challenges the Department of Commerce's

("Commerce") final determination rendered in a targeted antidumping duty investigation of

certain steel nails from the People's Republic of China ("PRC"). See Certain Steel Nails from

the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial

Affirmative Determination of Critical Circumstances, 73 Fed. Reg. 33,977 (Dep't Commerce

June 16, 2008) ("Final Determination"). The plaintiffs, Mid Continent Nail Corporation, Davis

Wire Corporation, Maze Nails and Treasure Coast Fasteners, Inc., collectively the domestic

industry, submitted a motion for judgment on the agency record. For the reasons stated below,

the court denies the plaintiffs' motion and grants judgment on the agency record in favor of the

United States.

## BACKGROUND

### I.      Targeted Dumping

Targeted dumping analysis is "an alternative method for determining the existence

of margins of dumping in an investigation . . . ." Targeted Dumping in Antidumping

Investigations; Request for Comment, 72 Fed. Reg. 60,651, 60,651 (Dep't Commerce Oct. 25,

2007) ("Request for Comment"). The purpose of this methodology is to enable Commerce to

identify dumping when a seller is providing lower prices to only certain United States purchasers

"by comparing the weighted average of the normal values to the export prices (or constructed

export prices) of individual transactions for comparable merchandise." 19 U.S.C. § 1677f-

1(d)(1)(B); see Request for Comment. By contrast, during an ordinary antidumping

investigation, Commerce determines "whether the subject merchandise is being sold in the

United States at less than fair value . . . by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise" or by "comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise." 19 U.S.C. § 1677f-1(d)(1)(A).

## II. Commerce's Investigation of Certain Steel Nails from the PRC

In May 2007, the plaintiffs filed petitions with Commerce concerning certain steel nails from the PRC. Certain Steel Nails from the People's Republic of China and the United Arab Emirates: Initiation of Antidumping Duty Investigations, 72 Fed. Reg. 38,816, 38,817 (Dep't Commerce July 16, 2007). In July 2007, Commerce initiated a targeted dumping investigation of certain steel nails from the PRC for the period of April 1, 2006, through March 31, 2007. Id. In September 2007, Commerce selected Illinois Tool Works Inc. and Paslode Fasteners (Shanghai) Co., Ltd. ("Paslode") and Xingya Group ("Xingya") as the mandatory respondents in the investigation. Certain Steel Nails From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances and Postponement of Final Determination, 73 Fed. Reg. 3928, 3930 (Dep't Commerce Jan. 23, 2008) ("Preliminary Determination"). In December 2007, the plaintiffs submitted an allegation of targeted dumping against Paslode and Xingya. Id. at 3931.

In its Preliminary Determination, published on January 23, 2008, Commerce used the methodology it had accepted in a previous investigation to conclude that targeted dumping

had occurred.[1]  Id. at 3939–40.  The following month, Commerce amended its Preliminary

Determination to correct significant ministerial errors with respect to the calculation of Paslode's

antidumping duty (AD) margin.  See Certain Steel Nails From the People's Republic of China:

Amended Preliminary Determination of Sales at Less Than Fair Value, 73 Fed. Reg. 7254 (Dep't

Commerce Feb. 7, 2008) ("Amended Preliminary Determination").  In the Amended Preliminary

Determination, Commerce calculated an AD margin of 4.70 percent for Paslode whereas

Xingya's AD margin remained unchanged at 44.57 percent.  Id. at 7255.  At that time, however,

Commerce stated that it intended to develop a new methodology to assess Paslode and Xingya's

alleged targeted dumping and requested comments on the matter.  Preliminary Determination, 73

Fed. Reg. at 3939.

On April 21, 2008, Commerce informed the plaintiffs of its new methodology

("the nails test") and set a sixteen day deadline for comments.[2]  (Pls.' Documentary App.

Accompanying Mem. of Law in Supp. of Pls.' Rule 56.2 Mot. for J. Upon the Agency R.  ("Pls.'

App.") Tab 6–8.)   The nails test consists of two stages.  Proposed Methodology for Identifying

---

[1] The P/2 test provides "that where the weighted-average net price to an alleged targeted purchaser or region is more than 2 percent lower than the weighted-average net price to non-targeted purchasers or regions in [merchandise]/month combinations representing a preponderance of the targeted quantity, a 'pattern' of 'significant' price differences" exists. Issues and Decision Memorandum for the Final Determination of the Less-Than-Fair-Value Investigation of Coated Free Sheet Paper from the Republic of Korea, A-580-856, POR 10/01/05-09/30/06, at 3–4 (Oct. 17, 2007), available at http://ia.ita.doc.gov/frn/summary/KOREA-SOUTH/E7-21035-1.pdf (last visited Apr. 29, 2010).

[2] The plaintiffs point out that they were afforded only fourteen days to comment because Commerce made clarifications on April 24, 2008.  See Investigation of Certain Steel Nails from the People's Republic of China: Issues and Decision Memorandum, A-570-909, POI 10/01/06-03/31/07, at 4 (June 6, 2008) ("Issues and Decision Memorandum"), available at http://ia.ita.doc.gov/frn/summary/PRC/E8-13474-1.pdf (last visited Apr. 29, 2010).

and Analyzing Targeted Dumping in Antidumping Investigations; Request for Comment, 73 Fed.

Reg. 26,371, 26,372 (Dep't Commerce May 9, 2008) ("Proposed Methodology").  The first

stage, the "standard deviation test," requires Commerce to calculate a standard deviation for all

of the sale prices of an item from a particular exporter.  Id.  Commerce then must add together

the volume for all of the items sold at a price below one standard deviation from the weighted-

average price.  Issues and Decision Memorandum at 20.  If this combined volume exceeds

thirty-three percent of the total volume of sales of that item from the particular exporter, the first

stage of the test is satisfied.  Id.  The second stage of the test, the gap test, is satisfied if the

volume of sales that qualify under a price gap comparison[3] exceeds five percent "of the total

[volume] of sales of subject merchandise to the allegedly targeted customer."  Proposed

Methodology, 73 Fed. Reg. at 26,372, amended by Issues and Decision Memorandum at 21 n.15.

The plaintiffs filed their case brief in response to the nails test on May 7, 2008.

(See Pls.' App. Tab 9.)  On May 9, 2008, Commerce published the nails test and provided the

public thirty days to comment.  Proposed Methodology, 73 Fed. Reg. at 26,372.  Commerce

subsequently extended this deadline until June 23, 2008.  Antidumping Methodologies for

Proceedings that Involve Significant Cost Changes Throughout the Period of Investigation (POI)/

---

[3] Under its methodology, Commerce must:

[D]etermine the total [volume] for which the difference between (i) the sales-
weighted average price to the allegedly targeted customer and (ii) the next higher
sales-weighted average price to a non-targeted customer exceeds the average price
gap (weighted by sales value) for the non-targeted group. Each of the price gaps in
the non-targeted group would be weighted by the combined sales associated with
the pair of prices to non-targeted customers that make up the gap.

Proposed Methodology, 73 Fed. Reg. at 26,372, amended by Issues and Decision Memorandum
at 21 n.15.

Period of Review (POR) that May Require Using Shorter Cost Averaging Periods; Request for

Comment and Proposed Methodology for Identifying and Analyzing Targeted Dumping in

Antidumping Investigations; Request for Comment, 73 Fed. Reg. 32,557, 32,557 (Dep't

Commerce June 9, 2008).  On June 16, 2008, however, Commerce published its Final

Determination, which adopted the nails test, and used it to calculate an AD margin of zero

percent for Paslode and 21.24 percent for Xingya.  Final Determination, 73 Fed. Reg. at 33,981.

        In August 2008, the plaintiffs filed a complaint contesting the Final

Determination.  In February 2009, the plaintiffs filed a motion for judgment on the agency record

pursuant to USCIT Rule 56.2.

## STANDARD OF REVIEW

        The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court will uphold

Commerce's final determinations in AD investigations unless they are "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).

## DISCUSSION

I.      **Reasonable Time under 19 U.S.C. § 1677m(g)**

        The plaintiffs allege that Commerce's actions deprived them of their due process

rights under the Fifth Amendment. (Mem. of Law in Supp. of Pls.' Rule 56.2 Mot. for J. Upon

the Agency R. ("Pls.' Mem.") 12–20.)  The plaintiffs claim that by providing the domestic

industry only sixteen days to comment on the nails test, Commerce did not afford enough time to

submit meaningful comments to demonstrate all of the nails test's errors.  (See Id. at 15.)  In

support of their position that the comment period was unreasonable, the plaintiffs cite the facts

that Commerce needed "several months" to develop the nails test, that Commerce typically affords parties fifty days to comment on preliminary determinations,[4] and that Commerce provided the public over thirty days to comment. (Id.) This claim lacks merit.

Congress has provided a fair process for commenting within the statutory language of 19 U.S.C. § 1677m. See 19 U.S.C. § 1677m(g). Subsection (g) provides that:

> Information that is submitted on a timely basis to the administering authority or the Commission during the course of a proceeding under this subtitle shall be subject to comment by other parties to the proceeding within such reasonable time as the administering authority or the Commission shall provide. The administering authority and the Commission, before making a final determination . . . shall cease collecting information and shall provide the parties with a final opportunity to comment on the information obtained by the administering authority or the Commission . . . upon which the parties have not previously had an opportunity to comment. Comments containing new factual information shall be disregarded.

19 U.S.C. § 1677m(g). Whether or not a constitutional due process right exists in these circumstances is an issue that need not be decided here because such a right would not require any more time to be afforded to the plaintiffs than is already required by statute. If Commerce provides a time period for comments that is unreasonable, it would be in violation of the statute. Compare 19 U.S.C. § 1677m(g), with Borden Inc. v. United States, 23 CIT 372, 375 n.3 (1999), rev'd on other grounds, 7 F. App'x 938, 938–39 (2001) (holding that "[t]he court applies a rule of reason in evaluating administrative due process claims"). Accordingly, the court considers the plaintiffs due process argument as a claim that Commerce violated the statutory due process requirement of 19 U.S.C. § 1677m(g).

---

[4] Under 19 C.F.R. § 351.309(c)(1)(i), any interested party for a final determination in an antidumping investigation, may submit a case brief "50 days after the date of publication of the preliminary determination or results of review . . . unless the Secretary alters the time limit." 19 C.F.R. § 351.309(c)(1)(i).

Generally, "[w]here a right to be heard exists, due process requires that right be accommodated at a meaningful time and in a meaningful manner." Barnhart v. United States Treasury Dep't, 588 F. Supp. 1432, 1438 (CIT 1984). Recognizing that "[w]ith more time most parties could improve the quality of their comments," courts ask whether there is "evidence that given more time [a plaintiff] would have, in fact, provided more meaningful comments." Sichuan Changhong Electric Co. v. United States, 466 F. Supp. 2d 1323, 1328 (CIT 2006). If, however, a plaintiff makes thoughtful comments that Commerce addresses in its determination, then, "as a practical matter, [the plaintiff] was not substantially deprived of an opportunity to be heard before the agency." Borden, 23 CIT at 375 n.3. This understanding has previously led the court to conclude that a comment period as brief as four days can be reasonable. See Sichuan, 466 F. Supp. 2d at 1329.

Despite having a full opportunity to demonstrate that the comment period was unreasonable by presenting the court with additional critiques of the nails test that they were not previously afforded the opportunity to develop, the plaintiffs have failed to provide any new and convincing arguments. Although the plaintiffs filed a thorough case brief, the court notes that most of their arguments are similar, if not identical, to the ones raised at the administrative level. (Compare Pls.' App. Tab 9, with Pls.' Mem.) The plaintiffs claim that they would have made many additional arguments if they were afforded more time to comment, yet now provide only one such example. (Pls.' Mem. 18.) They argue that the mean price was incorrectly used to calculate the standard deviation. (Id.) The plaintiffs contend that if the statistically correct median price were used, Commerce might have found dumping in this case. (Id.) Contrary to the plaintiffs claim, however, the use of a mean to calculate a standard deviation is, by definition,

a perfectly acceptable statistical method.  Christine Ammer & Dean S. Ammer, Dictionary of

Business and Economics 397 (1977).  Although median can be substituted for mean in certain

situations, such a substitution is not required.  See generally Yulia Gel, Weiwen Miao & Joseph

L. Gastwirth, The Importance of Checking the Assumptions Underlying Statistical Analysis:

Graphical Methods for Assessing Normality, 46 Jurimetrics J. 3, 26 (2005).  In addition, such

claims are merely speculative—the plaintiffs do not offer any numerical evidence to support their

contention that using a median would yield a different result.[5]

There is no evidence before the court, therefore, to suggest that the plaintiffs

would have provided more meaningful comments if they were afforded additional time to

comment.  Accordingly, the court holds that Commerce afforded the plaintiffs a reasonable time

to comment under 19 U.S.C. § 1677m(g).

## II.     The Nails Test

The plaintiffs challenge the Final Determination on the grounds that the nails test

violates 19 U.S.C. § 1677f-1(d)(B) and 19 C.F.R. § 351.414(f)(1)(i) and therefore, Commerce's

conclusion is not supported by substantial evidence.  Specifically, the plaintiffs argue that in

investigating their claim of targeted dumping, Commerce improperly considered only identical

products, used a statistically invalid methodology, and unreasonably defined terms.  (Reply Br. of

Mid Continent Nail Corporation, Davis Wire Corporation, Maze Nails and Treasure Coast

Fasteners, Inc. ("Pls.' Reply") 6–10.)  This claim lacks merit.

---

[5] Furthermore, the plaintiffs have failed to establish that it would have been futile to seek additional time for comment.  The plaintiffs stated at oral argument that although no formal request was made, informal conversations with Commerce indicated that a request would be denied.  Given the lack of a record on this, and in the context of this case there is no reason to presume what Commerce would have done in the face of a formal request.

Under 19 U.S.C. § 1677f-1(d)(1)(B), which essentially defines the targeted dumping remedy, Commerce "may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise," but only if "there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(B). In addition, 19 C.F.R. § 351.414(f)(1)(i) provided that Commerce must use "standard and appropriate statistical techniques" when determining whether sales qualify for this section. 19 C.F.R. § 351.414(f)(1)(i).[6]

Generally, courts lack an "independent authority to tell the [agency] how to do its job" when a statute does not specify "any Congressionally mandated procedure or methodology for assessment of the statutory tests." U.S. Steel Group v. United States, 96 F.3d 1352, 1362 (Fed. Cir. 1996). This silence has been interpreted as "an invitation" for an agency administering unfair trade law to "perform its duties in the way it believes most suitable" and courts will uphold these decisions "[s]o long as the [agency]'s analysis does not violate any statute and is not otherwise arbitrary and capricious." Id.

**A.      Commerce's decision to consider only identical products is supported by substantial evidence.**

The plaintiffs first claim that Commerce's decision to test only identical products

---

[6]Commerce withdrew 19 C.F.R. § 351.414(f) on December 10, 2008. Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations ("Revocation"), 73 Fed. Reg 74,930, 74,932 (Dep't Commerce, Dec. 10, 2008). At the time of the Final Determination, however, this regulation was effective.

was in violation of the clear language of 19 U.S.C. § 1677f-1(d)(B), which instructs Commerce

to consider "comparable merchandise." (Pls.' Reply 7.) Identical merchandise is comparable

merchandise. See 19 U.S.C. § 1677(16). In some cases it may be a smaller subset of all

comparable merchandise. Id.[7] In a case such as this, however, where all or virtually all the

allegedly targeted sales had identical matches, the statutory language does not require Commerce

to do more.[8] (Def.'s Supp. Br. and Confidential App. 2.) Based on this record, the court

concludes that Commerce's decision to consider only identical merchandise was supported by

substantial evidence and was in accordance with law.

**B.      Commerce's use of standard deviation is statistically valid.**

The plaintiffs claim that Commerce's use of standard deviation in the nails test is

unreasonable because "[a] standard deviation is simply a descriptive measure of a population; in

other words, standard deviation measures describe the dispersion of data, and then calculate how

spread out prices are from the average price." (Pls.' Mem. 24.) The plaintiffs go on to claim that

"[a]t the most basic level, then, the Department's starting point violated the regulatory

requirement that it use a 'standard and appropriate' statistical technique to determine whether

targeting was occurring" because, contrary to Commerce's assertion, "the standard deviation

cannot validly be used as a method to calculate a 'relative measure.'" (Id.)

---

[7] If Commerce must use other comparable merchandise to compare to U.S. sales it must make adjustments to get close to a price which may be compared. 19 U.S.C. § 1677b(a)(6)(C)(ii); 19 C.F.R. § 351.411. These adjustments provide an opportunity for the introduction of inaccuracies into the process.

[8] In fact, [[              ]] percent of the allegedly targeted sales had identical matches. (Def.'s Supp. Br. and Confidential App. 2.)

*Confidential Data Deleted*

Generally, a standard deviation is defined as "a measure of the tendency of individual values to differ from the mean." Christine Ammer & Dean S. Ammer, <u>Dictionary of Business and Economics</u> 397 (1977). "The standard deviation is the most common measure of dispersion," which is "the total spread of the values in a frequency distribution." <u>Id.</u> at 122. In statistics, a frequency distribution is "the organization of data to show how often certain values or ranges of values occur." <u>Id.</u> at 170.

As previously described, the nails test uses standard deviation to measure the dispersion of values in an exporter's price data, to aid in identifying which of the exporter's sales were relatively low compared to others.[9] See <u>Proposed Methodology</u>, 73 Fed. Reg. at 26,372. After the dispersion is identified, the nails test requires Commerce to use the thirty-three percent test to determine whether a "pattern" existed under the statute. <u>Id.</u> Thus, contrary to the plaintiffs' assertions, Commerce's use of standard deviation was, by definition, statistically valid because it was used to measure the dispersion of the sales prices.[10] This aspect of the nails test,

---

[9] The plaintiffs also contend that Commerce's reliance on the word "low" is <u>ultra vires</u> because it is not used within the statute. (Pls.' Mem. 24–25.) Although the plaintiffs are correct that the word "low" does not appear within the language of 19 U.S.C. § 1677f-1(d)(B), Commerce explains that this interpretation "strikes a balance between two extremes, the first being where <u>any</u> price below the average price is sufficient to distinguish the alleged target from others . . . and the second being where only prices at the very bottom of the price distribution are sufficient to distinguish the alleged target from others." <u>Issues and Decision Memorandum</u> at 17.

[10] Based on the evidence, the court is not convinced that the P/2 test is an inherently better test. The P/2 test, which draws a hard line at two-percent, is arguably only well suited for a particular type of market. Hypothetically, if the prices of the market greatly varied, most prices are likely to satisfy the two-percent requirement and this test may capture too many sales. Alternatively, if the prices were nearly uniform, few sales would satisfy the two-percent threshold and the test may not capture enough. In contrast, a standard deviation can be calculated for all types of dispersions and therefore, provides Commerce with a consistent method to analyze all markets.

therefore, is not in violation of 19 U.S.C. § 1677f-1(d)(B)(i).

     **C.**      **The nails test's definitions of "pattern" and "differ significantly" do not violate 19 U.S.C. § 1677f-1(d)(B)(i).**

The plaintiffs further challenge Commerce's definitions of "pattern" and "differ significantly" as arbitrary, unexplained, and unreasonable. (Pls.' Mem. 33–35.) Particularly, the plaintiffs claim that Commerce's use of thirty-three percent in its "pattern" definition and five percent in its "differ significantly" definition are seemingly random values with no meaning. (Id.) The plaintiffs contend that, in this case, these unreasonable definitions cause the nails test to overlook obvious targeting.[11] (Id. at 35.) This claim lacks merit.

As previously discussed, Commerce included a thirty-three percent threshold requirement in its definition of "pattern." Issues and Decision Memorandum at 20. Commerce explained that it considered thirty-three percent reasonable for establishing a pattern of activity. Id. The court has no reason to disagree.

Commerce defined "differ significantly" as any situation when the five percent price gap test is satisfied. Id. at 21–22. Commerce stated that it considered a five percent

---

[11] The plaintiffs spend several pages in their brief detailing hypothetical data sets in an attempt to illustrate this point and thus, expose Commerce's test as unreasonable. (See Pls. Mem. 28–31.) The plaintiffs argue that these examples clearly illustrate "targeted dumping" under 19 U.S.C. § 1677f-1(d)(B)(i), but would not be classified as such under Commerce's test. (Id. at 32.) The plaintiffs further contend that much like these examples, the facts of this case clearly support a finding of targeted dumping and that any finding otherwise cannot be supported by substantial evidence. (Id. at 29–30.) The plaintiffs' examples, however, are unconvincing because they oversimplify a market. Each example contains only a few hypothetical prices spread out at a great variance, creating a market where all of the extremely low prices fall within one standard deviation of the average price. (See id. at 28–31.) Such a result occurs because the hypothetical markets also contain extremely high prices that offset the low ones. (See Id.) The price variation of these markets are unrealistic, and therefore, raise few practical concerns regarding this methodology.

difference as significant, when used in combination with the thirty-three percent threshold, under

the statutory language. Id. at 22. Although these tests may create a standard that is more difficult

to satisfy than the domestic industry would have preferred, the nails test "does not violate any

statute and is not otherwise arbitrary and capricious." U.S. Steel Group, 96 F.3d at 1362. In

other AD contexts, and for a long period of time five percent tests have been used to measure

significance for AD purposes. See, e.g., 19 U.S.C. § 1677b(a)(1)(C) (1994) (using five percent

test to determine home market viability); id. § 1677b(a)(1)(B)(ii)(II) (1994) (using five percent

test to determine third-country market viability); 19 C.F.R. § 351.403(d) (1998) (using five

percent test to determine whether to "calculate normal value based on the sale by an affiliated

party"). Furthermore, plaintiff has done nothing to attempt to establish that on this record the

five percent requirement is unreasonably high. The various aspects of the nails test do not violate

the statutory language of 19 U.S.C. § 1677f-1(d)(1)(B)(i) and are applied reasonably based on

this record.[12]

### III.    Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations ("Revocation"), 73 Fed. Reg 74,930 (Dept. Commerce, Dec. 10, 2008).

In December 2008, Commerce issued an "interim final rule for the purpose of

withdrawing the regulatory provisions governing the targeted dumping analysis in antidumping

---

[12] The plaintiffs also contend that Commerce's test masks targeted dumping because it improperly averages all sales, both allegedly targeted and non-targeted to calculate the average-mean price. (Pls.' Mem. 25–26.) The plaintiffs claim that this practice is "distorting or biasing the comparison to a finding that targeting does not exist." (Id. at 26.) While including the alleged targeted sales in the average-mean calculation could lower the mean, excluding such sales could lead to the opposite result, perhaps raising the mean too high and increasing the chance that an otherwise non-targeted sale be classified as targeted. An inclusion of these prices, therefore, is no less reasonable than the exclusion that the plaintiffs desire.

duty investigations." Revocation, 73 Fed. Reg. at 74,930. Commerce explained that it "may have established thresholds or other criteria that have prevented the use of this comparison methodology to unmask dumping, contrary to the Congressional intent. In that case, these provisions would act to deny relief to domestic industries suffering material injury from unfairly traded imports." Id. at 74,931. The plaintiffs now cite these statements as evidence to support their arguments that given more time they could have provided more meaningful comments and that the nails test violates 19 U.S.C. § 1677f-1(d)(B).

Contrary to this proposition, courts have made it clear that unreasonableness cannot be inferred from a subsequent withdrawal. See FCC v. Fox Television Stations, Inc., 129 S. Ct. 1800, 1811 (2009) (holding that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency believes it to be better, which the conscious change of course adequately indicates"); GPX Int'l Tire Corp. v. United States, 645 F. Supp. 2d 1231, 1238 (CIT 2009) (holding that "[i]f the statutes are ambiguous, it does not matter whether Commerce's new interpretation of the statutes conflicts with its old interpretation, because the court is now looking at Commerce's new interpretation and will give that interpretation deference if it is reasonable").

Furthermore, in the Revocation, Commerce stated that it "believes the withdrawal of this rule is not significant. Withdrawal will allow the Department to exercise the discretion intended by the statute and, thereby, develop a practice that will allow interested parties to pursue all statutory avenues of relief in this area." Revocation, 73 Fed. Reg. at 74,931. Commerce also provided that it "is not replacing these provisions with new provisions. Instead, the Department is

returning to a case-by-case adjudication, until additional experience allows the Department to

gain a greater understanding of the issue." Id. By its very terms, therefore, the Revocation is not

an admission by Commerce that the nails test is unlawful—it merely demonstrates that

Commerce is dubious as to whether this particular methodology should be universally applicable

and announces that Commerce will continue to search for a widely applicable test.[13]

Accordingly, the Revocation has no effect on the court's conclusions in this case.

**CONCLUSION**

For the aforementioned reasons and based on this record, the court concludes that

utilization of the "nails test" for the targeted dumping analysis was reasonable and Commerce's

determinations were supported by substantial evidence, and in accordance with law.

Accordingly, the plaintiffs' Rule 56.2 motion for judgment on the agency record is denied.

Judgment, therefore, will be entered for the defendant.

 /s/ Jane A. Restani 
Jane A. Restani
Chief Judge

Dated: This 4th day of May, 2010.
          New York, New York.

---

[13] The court notes that the nails test has been used by Commerce in three subsequent investigations, two of which occurred after the issuance of the Revocation. See Polyethylene Retail Carrier Bags from Indonesia: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 74 Fed. Reg. 56,807, 56,809 (Dep't Commerce Nov. 3, 2009); Polyethylene Retail Carrier Bags From Taiwan: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 74 Fed. Reg. 55,183, 55,188 (Dep't Commerce Oct. 27, 2009); Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances, 73 Fed. Reg. 40,485, 40,485 (Dep't Commerce July 15, 2008).